[Crim. No. 935. Fourth Dist. Apr. 1, 1953.]

THE PEOPLE, Respondent, v. DOYLE VAN CLARK et al.,
Appellants.

Samuel Hurwitz for Appellants.

Edmund G. Brown, Attorney General, and Michael J. Clemens, Deputy Attorney General, for Respondent.

BARNARD, P. J.—The defendants were jointly charged with a violation of section 288 of the Penal Code, and a jury found each of them guilty. Their motion for a new trial and application for probation were denied, and judgment was entered referring them to the Youth Authority. They have appealed from the judgment and from the order denying their motion for a new trial.

The defendants were high school students, each being 18 years of age. The complaining witness was a 12-year-old orphan girl living with her grandmother in an apartment in Anaheim. On the evening of May 16, 1952, she left home to go to a picture show. In front of the theater she met four friends and decided to accompany them to a high school dance in Fullerton. She left this affair about 10 o'clock and was walking to the bus station, to take a bus to Anaheim, when the defendants came along in an automobile and took her in the car. She testified that one of the defendants grabbed her and forced her into the car, but the latter part of this was struck out as a conclusion. She then testified that the defendants took her to the vicinity of Anaheim, went off on a side road and stopped in an orange grove. It would serve no useful purpose to set forth her testimony as to what there occurred. ▮ If believed, this testimony was ample to establish all elements of the offense charged, and would be sufficient to show an attempted rape. She testified that each of the defendants performed the same acts; that they then drove back and let her out near her home; that she was crying; that a preacher and his wife were there, and her grandmother came up just then; that she told the minister and her grandmother about what had occurred; and that "they took me to the hospital."

A doctor at the hospital testified that he examined her about 11 p.m.; that she was crying and shrieking; that her panties were wet for about a quarter of their surface and sticky; that there was an odor resembling fresh seminal fluid, defining it; that he found that the hymen was not broken; that

he took fluid from the vaginal canal, and placed a drop on each of two slides; that he made a microscopic examination of these slides and observed no "moving" sperm; that he had neither time nor facilities to make other tests to see if sperm were present; that it was possible for semen and sperm to get in there even though the hymen was not ruptured; and that he turned the panties and the slides over to a police officer that same night. The police officer turned these slides over to a deputy sheriff, Captain Sharp, who was in charge of the bureau of identification. Sharp testified that he examined the slides under a microscope and identified five human spermatozoa. He made a photograph of one of these slides, which was received in evidence. The doctor was shown this picture on cross-examination and testified that the objects which appeared in the photograph looked like male sperm.

A police lieutenant, Taylor, testified that on the night of May 16th, he went to the hospital in Anaheim in response to a call; that this girl told him what had occurred and gave him a description of the three defendants so that he could put out a police broadcast to pick them up; that shortly after midnight he was informed that the defendants had been picked up and were at the Santa Ana police station; that he went there and had the girl and her grandmother brought there; that the girl identified these defendants as the persons in question; that in the presence of the girl, the defendant Hewlett said "She has identified me. I am the boy that she was telling you about"; and that he then interviewed each of the defendants alone. His testimony was that each of the boys told him about the same story. In substance, this was that someone at the Fullerton school suggested that they give this girl a ride to Anaheim; that they drove down the street and offered her a ride; that she got in the car voluntarily, saying she had to go home to Anaheim; that on the way to Anaheim they drove onto a side street and into an orange grove; that each in turn had attempted to have sexual intercourse with her "but it wasn't possible"; that two of them said they had excreted semen, one said that he had not; that one said that he could not have intercourse with her because she was too small or too tight; and that they also said that they had changed cars because they were afraid they might be picked up by the police, since the girl was crying when she got out of their car. Another officer testified that he was present and heard these same conversations. Taylor further testified that as he was taking the boys back to Anaheim that night they

were talking among themselves and he heard them say that they did not know the girl was 12 years old; that they thought she was 16 or 18; and that if they had known she was only 12 they would not have done anything like they did.

Another officer testified that he had a conversation with the defendant Gallegly a week or two after this incident in which Gallegly, in referring to the happening on the night of May 16th, told him that when the defendants found that the girl was a virgin they "quit fooling around" and took her home. The chief of police in Anaheim testified that on the next morning, May 17th, he had a conversation in his office with the defendant Clark and his mother, and that Clark told him, in his mother's presence, that he had attempted intercourse with this girl on the night before.

Each of the defendants took the stand and testified. They admitted taking the girl into their car, going to the orange orchard, and stopping there. They each denied committing any of the acts of which they were accused, and denied making any of the admissions that were testified to by Lieutenant Taylor. Their story was that they went to the school affair at Fullerton and then decided to go to one in Santa Ana; that as they were leaving some fellow asked them to give this girl a ride to Anaheim; that they went down the street and saw her walking; that they offered her a ride to Anaheim and she accepted; that as she was telling them where to go she told them to turn into the side road, and then told them to stop in the orange orchard; that they did not see any house but she told them there was one in back; that she told them she was afraid of her stepfather and did not want to go in, and wanted them to take her with them to Santa Ana; that they refused to do this and, after a little discussion, she asked them to take her to her grandmother's place in Anaheim; that they did so, and she was not crying when she got out; that they changed cars because one of the boys did not want to leave his car where it was parked; and that they were then arrested.

It is first contended that the evidence is insufficient to support the verdict. It is argued that the only direct evidence of guilt was the testimony of the girl, the rest being circumstantial; that the girl did not describe what was done in the usual manner, resulting in a "paradoxical situation" where the officers told of the defendants' admission of things which the girl herself had not described in similar language; that the girl concocted her story in order to distract her grandmother's attention from the fact that she had been to a dance

and was coming home late; and that it clearly appears that the trial judge did not believe the girl's testimony.

The testimony of the girl was amply sufficient in itself to support the verdicts. Her testimony was strongly corroborated by that of her grandmother as to her condition when she arrived home and of her immediate complaint, and by that of the doctor as to the condition of a part of her clothes, and as to the result of an examination almost immediately afterward. It was further corroborated by the testimony of four officers with respect to the admissions made by the defendants, most of them very shortly after the incident occurred. It is not argued that the girl's testimony is inherently improbable or unbelievable, but it is claimed that there are inconsistencies and uncertainties in her testimony. This is only natural in view of her tender age, the fact that she had been badly frightened and the time that had elapsed. There is nothing unusual or unnatural in the fact that she did not go into some of the details or use some of the language that might have been expected from an adult witness. The argument that the trial judge did not believe the girl's testimony is based on a remark made by him in denying the motion for a new trial. He then said: ". . . the girl's testimony is not very satisfactory in many respects, perhaps it is typical of a little girl's testimony. I do not believe the girl is too smart, and as far as that is concerned she didn't make a very good witness. Had she been the only witness, I am sure that the verdict would have been not guilty." On the same occasion he further said: "I have no doubt in my mind whatever as to the guilt of the defendants," and when counsel for the defendants asked to have the charge reduced to that of contributing to the delinqency of a minor as an included offense, he denied the request saying "I feel that they are not telling the truth, and they perjured themselves on the witness stand and committed another felony when they did that, and they are all sticking together when they do that." The admission made by one of the defendants was somewhat confirmed by equivocal testimony of his mother. After testifying that she was in the office of the police chief the next morning, she was asked whether she had then said to her son "Did you do what you are accused of?" She replied, "It wasn't exactly those words." When asked what she did say, she replied: "I said, 'Oh Doyle, you didn't do this.' " She was then asked whether Doyle had said in reply to this "I did" and she replied: "No, he did not." On cross-examination, Mrs. Clark was asked whether

anything else was said in that conversation and she replied that they had had a long conversation relating to the incident of the night before. She was then asked whether her son had then said anything at all about what he or the others had done, of a sexual nature, with this girl. She replied: ''He said he didn't rape that girl.'' She was then asked: ''Did he say whether or not he tried to?'' She replied ''No, he did not tell me whether he tried or not. I said 'I know you didn't do it.' '' She was then asked whether her son had told her at that time what did happen in the car, and she replied: ''No, I was very upset.''

The evidence is not only sufficient to support the verdict but when viewed in its entirety we are unable to agree with appellants' contention that this was a close case.

It is next contended that the court committed prejudicial error in failing to give, on its own motion, six instructions: 1. In failing to give a proper instruction on circumstantial evidence.. ▇▇▇ It is argued that while the court told the jury that where evidence was susceptible to two reasonable constructions, it must adopt the one favorable to innocence rather than the one favorable to guilt, it failed to tell the jury that where circumstantial evidence is relied on it must be irreconcilable with the theory of innocence, citing *People* v. *Hatchett*, 63 Cal.App.2d 144 [146 P.2d 469] and *People* v. *Rayol*, 65 Cal.App.2d 462 [150 P.2d 812]. In *People* v. *Koenig*, 29 Cal.2d 87 [173 P.2d 1], the court held that the failure to give such an instruction was not prejudicial under the facts of that case, as it was not in *People* v. *Bender*, 27 Cal.2d 164 [163 P.2d 8]. The court then pointed out the distinction in this respect between the Hatchett case and the Rayol case. In the instant case, there was ample direct evidence, and the circumstantial evidence was corroborative of the direct. It does not appear reasonable to believe that a further instruction in this connection would have affected the result. ▇▇▇ 2. In failing to instruct that oral admissions should be viewed with caution, citing *People* v. *Koenig*, 29 Cal.2d 87 [173 P.2d 1]. The court there held that such an instruction should have been given, but stated ''In view of the record in this case, however, it is improbable that had this instruction been given, the jury would have discounted this testimony to such an extent that it would have returned a different verdict.'' That is the situation here. Moreover, there was evidence that Lieutenant Taylor, the principal witness as to the admissions, took notes of what was said and

dictated these notes to a stenographer that night or the next day, so the usual possibility of a faulty memory is less persuasive here. ■ 3. Failure to instruct the jury "that the corpus delicti must first be proved," citing *People* v. *Frey*, 165 Cal. 140 [131 P. 127]. The court should have instructed the jury that proof independent of the statements of the appellants was necessary to prove the corpus delicti, but in this case there was ample proof irrespective of such statements and the error is not reversible. (*People* v. *Chan Chaun*, 41 Cal.App.2d 586 [107 P.2d 455].) ■ 4. Failure to instruct that while the jury was to consider the opinion expressed by experts, it was not bound to accept such an opinion as conclusive, and that it might disregard such an opinion if it found the same to be unreasonable. The only expert testimony, that of the witness Sharp, played a minor part in the case, could have had no controlling effect on the verdict, and no miscarriage of justice appears. (*People* v. *Brac*, 73 Cal.App.2d 629 [167 P.2d 535]; *People* v. *Moore*, 70 Cal.App.2d 158 [160 P.2d 857]; *People* v. *Williamson*, 134 Cal.App. 775 [26 P.2d 681]. ■ 5. Failure to give an instruction on lesser included offenses. It is argued that had such an instruction been given the jury might have rejected the testimony "that there was any touching," and have found the appellants guilty of the lesser offense of contributing to the delinquency of a minor. Not only was there no request for such an instruction, but the record shows that just before the cause was submitted to the jury counsel for the defendants approved the form of verdict, and stated that he did not desire any instructions with respect to included offenses. This cannot now be relied on as a ground for reversal. ■ 6. Failure to give a proper cautionary instruction to the effect that such a charge is easily made and difficult to disprove, and that the testimony of the victim should be examined with caution. Such an instruction was held to be necessary in *People* v. *Lucas*, 16 Cal.2d 178 [105 P.2d 102, 130 A.L.R. 1485], although it was there held that the failure to give it was not reversible error under the circumstances of that case. Such an instruction was here given, which is in the usual form except that a portion of it read: "From the nature of a case such as this, the *complaining* witness and the defendant usually are the only witnesses. Therefore I charge you that the law requires that you examine the testimony of the *prosecuting* witness with caution." (Italics ours.) It is argued that the two words we have emphasized may have misled the jury

into believing that Lieutenant Taylor was the "prosecuting witness," since he had been the investigating officer and was present through the trial. The appellants asked for the same instruction, in the identical language, using the words "complaining" witness and "prosecuting" witness interchangeably, which was refused as covered. Not only are they in no position to complain, but no such misleading of the jury appears as would justify a reversal on this ground.

▮ It is well settled that the question whether such errors are prejudicial must be determined from the circumstances of each case. (*People* v. *Putnam*, 20 Cal.2d 885 [129 P.2d 367]; *People* v. *Lucas*, 16 Cal.2d 178 [105 P.2d 102, 130 A.L.R. 1485].)

It is next contended that the court erred in giving five instructions which, while correct statements of the law, constiute error since they covered assumed issues which were without support in the evidence. It is argued that the following instructions placed a greater burden on the appellants than the law requires, and confused the jury by diverting its attention from the only defense interposed, which was that the appellants did not do the acts complained of. ▮ 1. That the court erred in telling the jury that the appellants were presumed to be sane at the time of the alleged incident, since they had not entered a plea of insanity. This was the usual stock instruction in connection with the matter of intent, and no possible prejudice appears. ▮ 2. That the court erred in giving an instruction on "rape" and "attempt to commit rape," since the appellants were not charged with either of those offenses. The court gave an instruction in the language of section 288 of the Penal Code, including the reference to "any lewd or lascivious act including any of the acts constituting other crimes provided for in Part One of this Code." Following this instruction the court stated that another crime set forth in part one of the Penal Code is that of statutory rape, reading the statutory definition thereof, and then stated that an attempt to commit rape is a crime under Part One of the Penal Code. This was apparently done to clarify the portion of section 288 read to the jury. There was evidence which would have established an attempt to commit rape, and no prejudice appears. ▮ 3. That the court erred in telling the jury that the fact that a defendant believed that the victim was past the age of 14 years was immaterial in this case. There was evidence that in a conversation that night the defendants, or some of them, had stated that they did not know that this girl was 12 years old, that they thought she

was older, and that if they had known she was only 12 they would not have done anything to her. There was no prejudice under the circumstances. 4. That the court erred in giving an instruction to the effect that want of consent on the part of this girl was not an element of the offense charged, and was immaterial in this case. Again, it is argued that this might have misled the jury, since the matter of consent had not been raised as a defense. This was part of the law applicable to the case, and neither error nor prejudice appears. 5. That the court erred in instructing the jury that this action was being prosecuted by the People, and not in the interest of any person injured. This is a fundamental principle of criminal law and no prejudice appears.

Appellants' final contention is that the court abused its discretion in permitting an expert witness to testify without a sufficient foundation with reference to his qualifications. The only witness to which this refers is Mr. Sharp, who was allowed to give his opinion that the objects appearing on the picture of the slide, with the enlargement or magnification of a drop placed on the slide by the doctor, were human spermatozoa. This witness testified that he had had 12 years' experience in the identification bureau of the sheriff's office; that he had had experience in the identification of male spermatozoa; that he had had some schooling and taken a short course in that subject; and that his experience in that line had been in the course of his police work. The matter of his qualifications was one which rested in the discretion of the trial court, and no abuse of that discretion appears. Moreover, his evidence was merely cumulative and the other evidence was amply sufficient to support the verdict.

It is argued that this is a close case and that the cumulative effect of these various claimed errors was to deprive the appellants of a fair trial. We are unable to agree with this contention. The evidence of guilt was not only sufficient but strong. While some of the instructions mentioned should have been given, although not asked for, it would be unreasonable to believe that the failure to give any or all of them could have affected the result, and we are far from convinced that any miscarriage of justice has occurred.

The judgment and order appealed from are affirmed.

Griffin, J., and Mussell, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied April 30, 1953.