Statement of the Case.
MONROE, C. J.
John Y. Gilmore, Sr., died intestate on May 15, 1900, leaving a widow an estate in community, and the four major children, who are the present litigants, and the widow and children were put in possession according to théir rights. The widow died June 9, 1909, and Víctor L. Gilmore, one of the plaintiffs herein, administered her estate as executor until February 3, 1911, when the district court gave judgment putting the heirs in actual possession of both estates, but reserving all rights as heirs which they might have had, or might have, against each other for any claims, of any nature whatsoever, that might be due by either or any one of them to the estate or to each other. While the administration thus mentioned was pending, Abner B. Gilmore, the other of the (two) plaintiffs now before the court, brought suit against his coheirs for the partition by Imitation of certain property known as the Sugar Planters’ Journal, in which suit other matters became involved, and it was held, that his title to four (of the five) eighths interest claimed by him in said property and in the Directory of the Louisiana Sugar Planters, as having been acquired from his mother, was not simulated, but that the transaction by which he acquired might furnish a basis for a demand for collation, and was also held that the right of the defendants to demand a further accounting with respect to his management of those properties between May 16, 1900, and June 9, 1909, should be reserved. Gilmore v. Gilmore, 127 La. 140, 53 South. 471. The present action is brought for the partition of the balance of the property of the two successions, and Abner B. Gilmore, joined by his brother, whose name appears in the title, are plaintiffs, and their brother, John Y. Gilmore, Jr., and their sister, Mrs. Mary Gilmore Harnett, and her husband, Edward M. Harnett, are defendants. The case comes up on the appeal of Abner B. Gilmore from a judgment upon oppositions to the homologation of the procés verbal of partition prepared'by the notary and the questions presented by the appeal and by the answers thereto relate to the correctness of the judgment appealed from: (1) In reducing the charge against E. M. Harnett for rent from $1,237.40 to $817.50; (2) allowing Mrs. Harnett $315 (to be charged against her three coheirs and herself) for excess in rent charge previously made and deducted from her share in her mother’s succession; (3) charging Abner B. Gilmore, for the benefit of Mrs. Harnett and J. Y. Gilmore, Jr., with net revenues of Directory of Louisiana Sugar Planters for years 1902, 1903, 1904', 1905 $2,300, of which the two parties named are each to receive one-fourth, or $575, and for years 1906, 1907, 1908, 1909 $3,250.50, of which they are each to receive one-eighth, or $406.31; (4) dismissing defendants’ demand that Abner B. Gilmore be required to collate the sum of *165 $1,000, received from Ms mother on August 7, 1905.
1. For some years prior to the death of Mrs. Gilmore she, with her son-in-law, Mr. Harnett, and his wife and child, had been occupying a residence which had belonged to the community that had existed between Mrs. Gilmore and her husband, and Mr. Harnett had paid $25 per month rent, and Mrs. Gilmore had paid a like amount for her board. At Mrs. Gilmore’s death Mrs. Harnett became the owner of a one-fourth interest in the house, and, her husband having previously purchased the one-eighth interest inherited by John X. Gilmore, Jr.,- from his father, they together owned three-eighths interest. They remained in the house after the death of Mrs. Gilmore, and were charged $25 per month rent during the first three months, but at the end of that time the executor, through his attorney, wrote a note to Mrs. Harnett to the effect that the rent should thereafter be $100 per month, of which (in view of her one-fourth interest, and of the executor’s ignorance of the fact that Mr. Harnett had acquired one-eighth interest) she would be expected to pay $75 per month. She received the note in the absence of her husband, and, interpreting it as an exhibition of the ill feeling that existed between the executor and herself, became somewhat excited, and answered at once, saying:
“We will remain in the house, despite your exorbitant rate of rental. We will be good for the rent, and are not ready to be put from the house yet.”
When, however, her husband was informed of what had taken place, he caused the executor to be notified that he would pay no such amount, and subsequently, and by way of compromise, he offe'red to pay $65 per month, which offer was not accepted. He and his family continued, however, to remain in the house for some 18 months, and until the executor was ready to sell it, when they moved out. The executor appears to have charged Mrs. Harnett with the entire rental, at the rate demanded by him, one half as due to the heirs of J. X. Gilmore, and the other half as due to the succession of Mrs. Gilmore; the total amount (including the rental for March, April, and May, 1911) being $1,237.50, one-half of which he deducted from her share in the succession. Mrs. Harnett, though not liable for any of the rent, makes no objection to the charge against her in the succession at a reasonable rate, but the uncontradicted evidence is that $65 per month was quite all that the property was worth, and hence the reduction ordered by the judge a quo. In preparing the projet of partition, plaintiffs herein appear to have realized that the person to be charged was the master of the community, and caused the whole charge to be made against him, to which he makes no complaint, save as to the rate, in so far as the amount due to the heirs of J. X. Gilmore are concerned. The executor was in error in addressing himself to Mrs. Harnett upon the subject of the rent, and in assuming that she was in any way bound for it, or bound by any supposed contract (repudiated by her husband) concerning it. He was also in error in assuming that by his mere ipse dixit he could impose upon persons occupying the relation to the property that Mr. and Mrs. Harnett occupied the obligation to pay an exorbitant rent. There was, therefore, no error in the ruling of the trial judge.
2. In the suit for the partition of the Sugar Planters’ Journal, the plaintiff, Abner B. Gilmore, in answer to a demand that he account for the management of the Directory of Sugar Planters of Louisiana, as a part or subsidiary of the Journal, denied that there was such relation between the two publications, or that his coheirs had any interest in the Directory. He admitted that there was a List of Louisiana Sugar Planters, which may have been copyrighted by Ms *167 father, but alleged that tbe copyright had been lost by failure to comply with the law, and that, even if it were still effective, the Directory, which he was then publishing was different, and was his property. His position, then, was that he owed no accounting for the List or Directory, because it belonged to him, and that, in any event, he owed no such accounting to the defendants for the period preceding his mother’s death, but, if at all, owed any accounting with respect to that period for which he might be called on to the succession of “his mother; and he testified in part as follows as to what he was willing to do in the way of accounting, to wit:
“Q. What do you intend to do about the business previous to 1909? A. We have not decided about that. I suppose the attorney for the estate or the executor will call on me, and I am prepared to answer any time they call. Q. Have you any objection to making a complete statement of receipts and expenditures of that business in this case, and then make any explanations or separations that you please? A. I have. * * * Q. Do I understand you to say that you will render to the estate of Mrs. Gilmore an accounting of your administration? A. Yes, sir. Q. During her lifetime? A. During her lifetime. Q. From the time of your father’s death? A. From the time of my father’s death. Q. Yes? A. If they ask me, I will; yes, sir. * * * Q. Any accounting prior to June 9, 1909, you will make to the executor of the estate or to the estate? A. If the executor demands it; yes, sir. Q. If he demands it? A. If he wishes an accounting, I will have it. Q. You wouldn’t make it to the defendants as heirs of the estate at all? A. Well, that is for the executor and his lawyer to say. I have nothing to do with that.”
The judgment rendered in- that case decreed the litigants to be part owners — in the proportions of five-eighths to plaintiff and one-eighth to each defendant — of the Journal and the Directory, required plaintiff to account for his management during the few months that had elapsed since the death of his mother, and reserved the right of the defendants to a further accounting with respect to the period between the death, of his father (May 16, 1900) and that of his mother (June 9, 1909).
The executor not having seen fit to demand any accounting, it was demanded by defendants in, their answer to the petition herein filed for a partition, and to the rule taken on them to show cause why they should not sign the act of partition as prepared by the notary; and, as Mr. Abner B. Gilmore showed no disposition to comply with the demand, defendants 'ruled him to show cause why an auditor should not be appointed to aid the court in ascertaining what accounting should be made, to which he and his codefendant, the executor, answered that their mother was the owner and usufructuary of the community property, and, as such, entitled'to the revenues; that respondents were prepared to establish beyond a doubt that she had received them ; and, the “settlement having been made with her during her life, no one has the right or authority to demand an accounting after her death.” In his examination as a witness in this case Mr. Abner B. Gilmore gave the following testimony in regard to the title to the Directory, which he had asserted and supported by testimony in the former case, and in regard to the disposition of the revenues therefrom which, under the decision in that case, should have been paid over to Mrs. Gilmore, to wit: *
“Q. Mr. Gilmore, did you render to your mother any accounting of the receipts by you, whether from sale of, or advertisements in, the Directory of Sugar Planters, from the date your father died, May 16, 1900, up to the date your mother died, June 9,. 1909? A. Yes, sir; I rendered her an accounting. * * * Q. Is it not a fact that you claimed up to the time of the judgment by this court, affirmed by the Supreme Court, that the Directory was yours? A. In my mother’s lifetime I never made such a claim. After my mother’s death, on the representations of different counsel than I have now, who deemed it best that I make a claim to ownership, since my mother acknowledged that the proceeds were mine — ‘Why not claim that the Directory is yours?’ — I did claim such, which was held not so. * * * Q. What did you do with the money representing the proceeds of the Directory from the time of your father’s death up to the time of your mother’s death? A. That money, between my mother and myself, was absorbed by myself — my living. Q. Well, you kept it all? A. Yes, sir. * * * *169 Q. When you say that you rendered an accounting to your mother, you don’t mean that you paid her anything? A. No, sir. Q. You mean to say that you considered, and you say she considered, that you were entitled to it? A. Exactly; that was the understanding; that I was running the paper under the consideration that the Directory money was mine. * * * Q. You didn’t make any actual accounting? A. Not wilting down receipts and expenditures? No, sir. Q. By accounting you mean that you considered that she understood that you were to keep everything? A. I accounted to her — here—I issued the Directory — the money is yours; yes, sir. ■ Q. You kept it, and that is the accounting you gave her? A. Yes, sir. Q. Now, will you please tell the court how much those receipts and expenditures were for those nine years? A. That is a matter hard to say; you go too far; I cannot answer; I refer you to my previous testimony; that is the best I have; it was fresher two years ago than it is now; I have not looked over it. Q. You cannot give data on that? A. No definite information.”
As the witness, on the occasion to which he refers, had assumed the position that he owned the Directory, and, moreover, that he owed them no accounting, even with respect to property that belonged in part to them, for the period preceding his mother’s death, it is evident that, in their attempt to obtain such accounting in this ease, the defendants were thrown entirely upon their own resources, without even the aid of an expert accountant, since their application for the appointment of one was dismissed. - It is not surprising, therefore, that in denying plaintiffs’ application for new trial, the learned judge of the district court should have used the following language:
“I decline to grant a new trial herein in order to enable A. B. Gilmore to give the ac^ counting of his administration of the Louisiana" Sugar Planters’ Directory, which he has persistently refused, though it has been persistently demanded * * * since the institution of this suit. His refusal was originally based on the pretention that the Directory was his property ; and, since that pretention failed of recognition by the court, he has advanced the claim that the revenues of the Directory were given him by his mother in compensation for his services. That claim (evidently an afterthought, inconsistent with his original claim of ownership) having also been rejected by the court, he now seeks to have this case tried anew, for the purpose of showing, by evidence which, if it exists, he has willfully withheld, that the accounting made for him by the court, in the light of the* evidence before it, is erroneous. This cannot be done. A. B. Gilmore took the chance of an adverse decision upon his alleged nonliability to account, prevented the appointment of an expert to examine his books, and compelled his opponents to furnish as best they could data for the accounting demanded. It is too late for Mm to say that the data are incorrect, and that he has all the time been in possession of the full evidence on the subject, and is now willing to produce it. If he has been condemned to pay more than he actually owes, he has only himself to blame. The court’s judgment is based, for the most part, upon the statements, reluctantly drawn from him by defendants, as to average annual receipts from the Directory. The court is satisfied that it has done him full justice, except as to the year 1909, when it failed to allow him credit for $106.60, with which he had been charged in the other partition suit” (and which error, the court, by consent of counsel then and there corrected).
Opinion.
[1] This ruling we find to be eminently correct, and we have only to add that A. B. Gilmore has sworn several times that he issued the first separate copy of the Directory in 1905, and assigns that as a reason why the judgment appealed from is incorrect in ordering him to account for the years 1902, 1903, and 1904. But defendant’s counsel produced and filed in evidence such separate copy issued in 1902. Again, while the witness testified that he accounted to his mother for the revenues from the Directory by keeping them himself, he does not testify that his mother was ever informed that there were any revenues in excess of the expenses, and, if he was no more communicative in his dealings with her than he has been with the court, she was not in a very good position to inform herself.
[2, 3] The obligation of an agent to keep and render a correct account, the presumption of neglect or infidelity in the event of his failure so to do, and the rule that, in such case, every doubt will be resolved against him and in favor of his principal, are *171 matters of almost universal recognition in jurisprudence. Hen. Dig. 528, No. 16; Cres. City Ice Co. v. Ermann, 36 La. Ann. 841; Holmes v. Murdock, 125 La. 916, 51 South. 1035; 16 Cyc. 105; 31 Cyc. 1475; 39 Cyc. 464, 476; Story on Agency, § 332; Frethy v. Durant, 24 App. Div. 58, 48 N. Y. Supp. 839; Landis v. Scott, 32 Pa. 495; Ill. Linen Co. v. Hough, 91 Ill. 69.
3. When the previous suit for the partition of the Journal was before us, we were unable to reach the conclusion that the conveyance by Mrs. Gilmore to A. L. Gilmore of her interest in that property was simulated, but we saw nothing then, nor, do we see anything now, upon which a judgment could be predicated maintaining that conveyance as a remunerative donation or as a donation intended as an extra portion. Plaintiff A. L. Gilmore testified that, though he was receiving one-half of the profits earned in the publication of the Journal, and though he was also receiving, as it appears, all the profits earned in the publication of the Directory, he complained to his mother that he had not received enough in the past, and that she “paid” him $1,000 for past services, which amount, after consultation with, he immediately returned to, her in payment of the price of her half interest in the Journal, which was conveyed to him by a formal act. It is somewhere suggested that the act was signed in duplicate, or that there was an original and a copy, but, so far as we know, the act (original), duplicate or copy, which was filed in evidence was produced from the bank box of Mrs. Gilmore after her death, and, until it was so produced, neither of the defendants herein had any knowledge of its existence, though Mrs. Harnett and her mother lived in the“same house-during the four years (about) which intervened between the execution of the act and Mrs. Gilmore’s death; to which it may be added that, so far as we are informed, the matter was not referred to in Mrs. Gilmore’s will. Dr. V. L. Gilmore testifies that his mother told him that she intended to convey her interest in the Journal to A. B. Gilmore, and after-wards told him that she had done so; but he said that he had not conveyed that information to the defendant, John Y. Gilmore, Jr., and was unwilling to say that he had conveyed it to Mrs. Harnett, who testifies that she did not acquire it until after her mother’s death. He does not testify that his mother told him that she intended to give or pay, A. B. Gilmore $1,000 in money in order that he might buy the interest in question, or that she had done so. The following questions were propounded to, and answered by, him, the one by the counsel who represents A. B. Gilmore, as well as himself, the other by counsel representing defendants, to wit:
“Q. (by plaintiffs’ -counsel). Were you fully aware of the sale — were you aware of the sale of the Sugar Planters’ Journal to Abner Gilmore at the time it occurred? A. My mother told me before that she would do it, and she told me after that she did it. I was not in town when she did it. She told me before and after, and her reasons — gave her reasons for it.”
He was not asked what the reasons were, and he did not say.
“Q. (by counsel for defendants). You say that your mother told you about the transfer of the interest in the Sugar Planters' Journal? A. I said so. Q. Did you tell Mrs. Harnett about it? A. I don’t know if.I did or not; I may have. * * * Q. Did you tell John Y. Gilmore? A. No, sir; I didn’t tell John Y. because I never saw him. * * * Q,. Did you ever tell Mr. Harnett about it? A. Not that I know of.”
It will be observed that plaintiffs’ counsel uses the word “sale” in his question, and defendants’ counsel uses the word “transfer”; and there is nothing to indicate that the attention of the witness wasi at all attracted to the difference. Another thing worthy of note is that Mrs. Gilmore had it in contemplation to convey the interest in question to A. B. Gilmore for a time (though how long *173 does not appear) before she executed her purpose, which is hardly consistent with the testimony that A. B. Gilmore gives concerning his acquisition of that interest, from which it would appear that he had been dunning his mother to pay him something additional for his past services, and that she finally delivered to him $1,000, and with it gave him some advice as to the use that he should make of it; his testimony being, in part, as follows:
“Q. She issued you a check for $1,000, didn’t she? A. I don’t recall it; it was a check or cash; it was three or four years ago; I think it was cash. * * * Q. Now, you say that she paid you this cash at that time — for what? A. For services rendered. Q. What services? A. Conducting the business from which she derived her income. Q. You mean this paper? A. Yes, sir. Q. Covering what period of time? A. Several or more years — two or three — I don’t recollect exactly. It may be two or three —no less than two. * * * Q. She just paid you $1,000 cash? A. She paid me $1,000 cash. Q. There was nothing drawn up specifying what period of time it covered? A. Nothing more definite than what she said two or three years before. I had demurred at the amount I was making, and she said, T will pay you more later.’ 1 said, ‘When?’ ‘Leave that to me.’ I left it to her until 1903. Then she was going away — 1905, I think it was. Before she went away I asked my mother when she would pay me the money. She said she would pay me over and above what appeared on the books as received by me. She says, T will pay you now, since I am going away, or next week.’ And she paid me the money. When she did, she said, ‘Now, my son, you must make good use of that money; why not put it where you will save it?’ I didn’t know what to do; whether to go to the Building Association or take the money and use it otherwise; and she said, T would suggest that you buy your brother John’s interest.’ I said that I didn’t care to do business with my brother John.' We talked over that, and came to the conclusion that the best use I could make of the $1,000 was to buy her interest, which I did. I bought her interest for the $1,000.”
The whole transaction was completed within a day or two; but the act of conveyance was drawn up by, and signed in the presence of, the late R. H. Browne, a prominent member of the bar, on August 5th, and he testified that, to the best of his recollection, neither money nor check passed between the parties in his presence. It does appear, however, that plaintiff deposited $1,000 on August 4th, and drew a cheek in favor of his mother for that amount on August 7th, which appears to have been indorsed by her and paid on that day. It is apparent that, if the idea of selling her interest in the Journal occurred to Mrs. Gilmore for the first time during the conversation thus narrated, she could not have told Dr. Gilmore about it before; and, if it had occurred to her before, and she intended to convey it in payment for past services, why should she have resorted to the circumlocution of furnishing her son with $1,-000 with which to go through the form of buying it? And, again, why should she first advise him to buy the one-eighth interest of John Y. Gilmore, when she was willing to sell her one-half interest apparently for the same price? There is an air of improbability about the whole affair that, in view particularly of the fact that Mrs. Gilmore is no longer among the living, requires something more than the wholly uncorroborated testimony of the sole surviving party in interest for its clarification. We know that the decedent conveyed to one of her children a portion of her estate, and we do not know, because the evidence is not sufficiently strong to establish it, that the conveyance was made for a sufficient consideration to prevent it from operating to destroy the equality among her heirs that the law insists upon. If she intended the interest conveyed to be an extra portion, she should have so expressed herself in one of the methods provided by law. The method adopted by her, which has the appearance of a disguised donation, not being one of those so provided, we are of opinion that appellant should collate, for the benefit of the defendants herein, by taking less from the succession of his mother by $500, with legal interest from judicial demand, than *175 the share to which he might otherwise he entitled. C. C. 1229, 1230, 1231, 1232, 1233; Dupuy v. Dupont, 11 La. Ann. 226; Laycock v. Bird, 13 La. Ann. 173; Montgomery v. Chaney, 13 La. Ann. 207; Soules v. Soules, 104 La. Ann. 796, 29 South. 342; Champagne v. Champagne, 125 La. 408, 51 South. 440; Cross on Succession, pp. 140, 500, 501.
It is therefore ordered that the judgment appealed from be avoided and' reversed in so far as it rejects the demands of the defendants herein; and it is now ordered that there be judgment in favor of Mrs. Mary Gilmore Harnett and of John X. Gilmore, Jr., and against Abner B. Gilmore, plaintiff and appellant herein, requiring him to collate, by taking less, the sum of $500, with legal interest thereon from judicial demand, and that said amount inure to the benefit of said defendants in equal proportions. It is further ordered that in all other respects said judgment be affirmed, at the cost of the appellant.