[Crim. No. 5359.   Second Dist., Div. Three.   Dec. 28, 1955.]

THE PEOPLE, Respondent, v. JOSEPH M. BURMAN, Appellant.

*Assigned by Chairman of Judicial Council.

Richard R. Cody for Appellant.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

VALLÉE, J.—Defendant was charged by information in six counts with separate grand thefts from Pickwick Book Shops, a corporation, and in one count with violation of section 3020, subdivision (b), of the Corporations Code, in that he unlawfully altered, mutilated, and destroyed records of Pickwick with intent to defraud and conceal the record of his thefts.[1] The thefts were charged to have been committed in 1953: $2,372.93 on December 9; $2,599.85 on December 16; $2,509.16 on December 18; $3,534.88 on December 22; $3,683.44 on December 24; and $1,052.58 on December 31. A jury found him guilty as charged in each count and sentence to state prison followed. He appeals from the judgment and the order denying his motion for a new trial. He contends the evidence is insufficient to support the verdicts and that the court erred in one ruling on the admission of evidence.

---

[1] Corporations Code, section 3020, subdivision (b), reads: ''(b) Every director, officer, agent, or shareholder of any corporation, domestic or foreign, who, with intent to defraud, destroys, alters, mutilates, or falsifies any of the books, papers, writings, or securities belonging to the corporation, or makes or concurs in making any false entries, or omits or concurs in omitting to make any material entry in any book of accounts or other record or document kept by the corporation is guilty of a public offense.''

Pickwick Book Shops since 1946 has been in the business of buying and selling books in a two-story building in Hollywood. Mr. Epstein was president; Mr. Robertiello, secretary; and Mr. Stackhouse, manager. The corporation paid Epstein and his wife 5 per cent of gross sales as rent for the building. All records of the corporation were kept on a cash basis. Detailed records were kept on cash register tapes of each cash sale and on a "Whiz" machine of charge accounts. Charge sales were not treated as actual sales until the cash was received, at which time the cash was registered on the cash register tape. At the end of the day each salesman made a detailed record and report of his sales; placed $50 in an envelope with which to commence the next day; and placed the balance in another envelope, sealed, initialed, dated it, and put it in the safe.

In July, 1952, defendant was employed as office manager and bookkeeper of the corporation. His duties were to keep the books; to take the sealed envelopes containing the money and the salesmen's cash reports from the safe each working morning after it had been opened by Epstein or Stackhouse and check to see that the money in the envelope and the report corresponded and that that amount was the same as the cash register total for the particular salesman; to enter on a cash reconciliation sheet the cash register totals of each salesman's money received and the contents of the envelopes; to keep a "Cash Paid-Outs" record; to take the money and deposit it each day that the bank was open and, if the bank was not open, to make out a separate deposit slip for the money and have it ready to deposit on the next day that it was open; to see that all moneys and checks were properly banked; to see that all accounts were paid; to make out checks for payroll and purchase accounts; to obtain cancelled checks and statements from the bank and make the bank tally; to make up various tax returns; and to preserve all records of the corporation. The cash reconciliation sheet gave an over-all picture of the amount of money which each salesman reported as the previous day's receipts. The total of "Cash Paid-Outs" for each day was entered on the cash reconciliation sheet, and the sheet would give the exact amount of money which was to go to the bank for that day.

At the time defendant was employed he was instructed that a separate bank deposit of money was to be made for each day that the shop was open; and if the bank was not open on Saturdays, to make two deposits on Monday, one for Friday business and one for Saturday business, on separate

deposit slips. He was specifically instructed by Epstein, Robertiello, and Levy, the bookkeeper who preceded him, that all records of the corporation were to be kept on a cash basis and that in making up sales tax returns he was not to include charge sales until payment was received, that charge sales were memorandum charges, they did not appear in the records, and they became sales only when the cash was received. The records were kept in a closet which was locked each night by defendant.

During the month of December, 1953, defendant prepared a special comparison record each day, comparing sales between December, 1952, and December, 1953, and gave it to Epstein. It showed the total cash receipts for the month up to and including the previous day for each day after December 5. The total sales from December 1st to 5th were stated in a lump sum on the 5th, and each day's receipts thereafter were added thereto. Epstein could subtract the previous day's total from the instant day's total and learn the amount of cash business for the previous day. Defendant prepared sales tax returns for the month of December, 1953, based on cash actually received by the bookshop for that month, which showed total sales in December of $60,516.80. Early in January, 1954, he gave Epstein for the latter's signature a check in the amount of $2,914.83 payable to Epstein as 5 per cent of the total cash sales for December, representing the rent for that month.

Defendant did not return to the bookshop after Friday, January 8, 1954. He had not spoken to either Epstein or Stackhouse about leaving. On January 9 and 11, 1954, it was discovered that most of the records and books of the corporation for the period extending back to July, 1952, the time defendant was employed, were missing. Most of the missing records had been prepared by defendant, were in his care and custody, and were kept at the bookshop. Defendant did not at any time before he left ever report or mention to Epstein or Stackhouse that any records were missing, and he had not been given permission to remove any of them.

On January 9, 1954, defendant, under the name Joseph J. Palmer, bought a 1954 Lincoln Capri coupé from an automobile dealer in Chicago, paying $4,450 cash for it. On January 11, 1954, under the same fictitious name, he opened a joint account with Shelby E. Palmer in First National Bank of Canton, Ohio, with a $500 deposit. He made these

additional deposits: $500 on January 14, $3,000 on January 22, $500 on January 29, $2,500 on February 5, $850 on February 26, $1,200 on March 11—a total of $9,050 deposited. On January 22, 1954, defendant bought a trailer in Elkhart, Indiana, paying $2,685.55 by check drawn on First National Bank of Canton, Ohio.

Prior to the trial an accountant made an audit of the available records of the bookshop to determine the total cash receipts for the month of December, 1953. He prepared and there was introduced in evidence a chart showing the receipts for each working day after December 5 and the amount deposited in the bank each day. He testified the total receipts were $60,236 and the total bank deposits were $44,431.25.

Defendant testified that he did not at any time take any money or property from the bookshop, nor did he remove, hide, or conceal any of the records. He attempted to reconcile the amounts shown as cash received with the bank deposits by testifying that the cash received included not only cash sales but also charge sales. He testified he had informed Epstein that he was leaving at the end of the year and that Epstein had asked him to stay a few days longer to get everything in shape before he left. He said he had received about $8,000 together with a note for $2,025 from his mother's estate in 1952; he later collected the note; in August, 1953, he had between $28,000 and $30,000 in cash which included the money he had received from his mother's estate, savings from his income and a business his wife had, and winnings of $3,400 playing roulette at Las Vegas in the summer of 1953, that he kept the money in a safe deposit box in a bank in Hollywood, and he sold his De Soto on January 2, 1954, for $1,900.

Embezzlement is the fraudulent appropriation of property by a person to whom it has been entrusted. (Pen. Code. § 503.) A person entrusted with or having in his control property for the use of any other person who fraudulently appropriates it to any use or purpose not in the due and lawful execution of his trust, is guilty of embezzlement. (Pen. Code, § 506.) A person guilty of embezzlement is guilty of theft. (Pen. Code, § 484.)

The evidence is sufficient to support the verdicts. Defendant was entrusted with the money of the corporation and had it in his control. There was evidence that in each of the six months prior to December, 1953, the total sales and the bank deposits were substantially the same, showing that defendant kept the records on a strictly cash basis. The

comparison record for December prepared by defendant, which he gave to Epstein, showed that total sales were reported as $60,822.62. The sales tax returns prepared by defendant showed total sales for December as $60,516.80. The jury could reasonably infer that such reports reflected cash sales and that the cash receipts of the bookshop during December were in the neighborhood of $60,000, and that that amount of money came into defendant's possession for the purpose of setting up the records and banking it. The bank deposits in December were only $44,431.25. The jury could reasonably conclude that defendant received about $15,000 belonging to Pickwick for the purpose of banking it and that he did not bank it.

Examination of the deposit records of the bank together with a computation of daily cash sales made from the comparison records and the cash paid out from the registers shows that a deposit was made in substantially the same amount as the computed daily cash sales less that day's cash paid out for each previous day on which the bookshop was open from December 7, 1953, through January 4, 1954, except for the daily cash sales less cash paid out for December 9, 16, 18, 22, 24, and 31. Analysis of the comparison records and the "Cash Paid-Outs" records warrants the inference that in December the following amounts were available for deposit from the previous day's receipts and that they were not deposited: $2,372.93 on the 10th, $2,599.85 on the 17th. $2,509.16 on the 21st, $3,534.88 on the 23d, $3,683.44 on the 28th, and $1,052.58 on January 4. These were the amounts charged to have been embezzled.

The jury was justified in concluding that defendant appropriated these moneys to his own use. He left his employment without informing his employer. The next day he, a bookkeeper, spent $4,450 in Chicago for a Lincoln, using a fictitious name. During the next two months he deposited $9,050 in cash in a bank in Ohio, using a fictitious name. His salary at the bookshop was $75 a week when he started and $5,000 a year when he left. The evidence also warranted the conclusion that defendant destroyed the records of the corporation in an effort to cover his thefts. The jury did not have to believe the testimony of defendant or that of two witnesses who testified he won between $1,000 and $1,200 playing roulette in Las Vegas in July, 1953. (*People* v. *Batwin*, 120 Cal.App.2d 825, 827 [262 P.2d 88].)

▮ The court did not err in permitting the accountant

to testify to the results of his examination of the records which were available after defendant's flight. The records he examined were numerous. Whether he was qualified was a question for the trial court which will not be disturbed in the absence of an abuse of discretion. (*People* v. *Clark*, 117 Cal.App.2d 134, 143 [255 P.2d 79].) No abuse of that discretion is shown. ■ There may be evidence of the contents of a writing other than the writing itself when the original consists of numerous accounts or other documents which cannot be examined in court without great loss of time and the evidence sought from them is only the general result of the whole. (Code Civ. Proc., § 1855, subd. 5.) Such was the case here.

The judgment and the order denying a new trial are affirmed.

Shinn, P. J., and Wood (Parker), J., concurred.