[Civ. No. 24409. Second Dist., Div. Two. July 28, 1960.]

A. W. KENNARD et al., Respondents, v. COULSON B. GLICK, Appellant.

James E. Satt and Bernard Grossman for Appellant.

Robert L. Gardner for Respondents.

ASHBURN, J.—Appeal from judgment for $4,535.93 in an action brought for the recovery of monies of plaintiffs which were received by defendant Coulson B. Glick as their agent and then misappropriated to his own use.

The plaintiffs purchased from a third person a wholesale-retail bird store and conducted the business under the name "Bird Wonderland and Zoo." Appellant Coulson B. Glick had owned the business for some 20 years and had sold the same to plaintiffs' immediate vendors. He stayed on after plaintiffs' purchase for the purpose of assisting them in operating the business. He filled orders, assisted in the purchase of birds, made entries in the books, answered the mail, and made the bank deposits. Respondents maintained a bank account under the name of Bird Wonderland in the Security-First National Bank on Ventura Boulevard, Sherman Oaks. Appellant maintained an account in the California Bank, Van Nuys Branch, under the same name. Appellant admitted that he deposited between six and eight checks received in the business to his own account by endorsement with his rubber stamp (Bird Wonderland, C. B. Glick) without advising respondents of this act; that these checks amounted to $452. Appellant also maintained a post office box in Van Nuys under the name of Bird Wonderland where he received a number of checks payable to Bird Wonderland; he admitted depositing one such check to his own account.

The complaint alleged and the court found upon ample evidence that defendant "represented to plaintiffs that defendants would assist plaintiffs in the proper care and maintenance of the birds and animals owned by plaintiffs and to be acquired by plaintiffs, and further that defendants would record in plaintiffs' ledger book all entries of cash receipts and disbursements in conjunction with plaintiffs' aforesaid business; and further that defendants would make all deposits of cash receipts in plaintiffs' bank account; that plaintiffs thereupon authorized defendants to perform the acts aforesaid and to act in said capacity in the belief that defendants would make true and accurate entries into plaintiffs' books and deposit all monies received by BIRD WONDERLAND AND ZOO in plaintiffs' bank account. That the aforesaid course of dealing between plaintiffs and defendants commenced on or about the 15th day of February, 1955, and was maintained to and including the 31st day of March, 1957. That on or about the 31st day of March, 1957, plaintiffs first discovered that defendants had, at divers times and in divers amounts between the 15th day of

February, 1955 and the 31st day of March, 1957, unlawfully taken and converted and disposed of the same to their own use the aggregate sum of $15,000.00 of monies and funds belonging to plaintiffs, which monies and funds had come into said defendants' possession by virtue of the course of dealing between plaintiffs and defendants as described hereinabove," except that the court fixed the amount so misappropriated at $4,535.93, for which amount it awarded judgment against appellant.

His wife, Lucille Goodwin Glick, was granted a nonsuit. That portion of the judgment awarding to appellant upon his cross-complaint the sum of $366.40 is not involved in this appeal.

 Appellant's main contention is that there is no evidence to support a judgment in excess of $452, the amount of his admitted defalcation.

Respondent Kennard testified that he had obtained from customers several checks totaling approximately $700 which had been deposited to appellant's bank account, with which he confronted appellant. He told appellant that "I don't know how much you have taken. We can check the books and find out." Appellant objected to an audit of the books, saying "We'll both go to the penitentiary." Later, after this action was filed, Warren Nelson, a certified public accountant, at the request of both parties and upon payment of a fee shared equally by them, made an examination of the books and other records of Bird Wonderland covering the period during which appellant was on respondents' premises for the purpose of ascertaining the amount of money that would have been available for deposit as compared to the amount actually deposited.

The record reveals that appellant was upon the premises from February 15, 1955, to March 31, 1957, with the exception of two periods when he was away on other business, each for a duration of approximately two months; except during these brief absences he made all of the bank deposits and kept the books. It is significant that there were essentially no discrepancies between the bank deposits and the money available for deposit during the periods that appellant was absent from the premises. Mr. Kennard made no actual bookkeeping entries. Respondents knew nothing about bookkeeping. Appellant was teaching Mrs. Kennard how to keep the books and a small percentage of the entries were made by her.

Warren Nelson, testifying for respondents, stated that in making his audit he had all of the records that the business

had put together. To determine the gross sales, Nelson totaled all of the sales invoices. Some of the sales were on credit, sometimes with a cash down payment, so he deducted such amounts as were not due or paid as of March 31, 1957. He then deducted amounts paid out in cash by the respondents as shown by the general ledger. The resulting balance of $73,249.82 represented the total sum available for deposit. He determined that the total amount actually deposited was $66,196.01, making a net difference of $7,053.81.

The books were in such condition that appellant's brief designates them as "incomplete, inaccurate and untrustworthy business records." Defendants' expert witness Lurie testified that the records "were very inadequate and in some cases impossible to determine the nature of the transaction." Also "I don't believe that a report could be rendered which would be of any value because of the inadequacy of the records." With this statement Mr. Nelson agreed. The court, in its summation, said "I appreciate that the books are a hopeless mess and I seriously doubt if the real truth will ever be known. I don't believe it could ever be ascertained if this case went on for weeks or was tried and retried."

That Mr. Nelson's method of comparing monies available for deposit with the amount of actual deposits is basically sound appears from the decisions in *People* v. *Burman,* 138 Cal.App.2d 216, 221 [291 P.2d 49] ; *Margolis* v. *Teplin,* 163 Cal.App.2d 526, 533 [329 P.2d 535] ; *Meddaugh* v. *Stroup,* 131 Cal.App. 304, 306 [21 P.2d 138]. During cross-examination Mr. Nelson conceded that certain corrections should be made in his figures, as a result of which the court reduced his aggregate of defalcations from $7,053.81 to $4,535.93 and explained his process of reasoning in so doing. Counsel for appellant presents numerous arguments directed at this conclusion but they amount merely to an effort to have us reweigh the inferences to be drawn from the evidence, a thing which a court of review cannot do.

Appellant was the agent of respondents entrusted with the duty of receiving and disbursing monies and keeping accurate records of all transactions conducted by him. His relationship was undoubtedly fiduciary. He admits he did misappropriate some of respondents' funds but seeks to hold them to the impossible burden of establishing just how much he did take. This argument overlooks basic principles here applicable.

"*An agent who fails to keep an account* raises thereby a suspicion of infidelity or neglect, creates a presumption

against himself, and brings upon himself the burden of accounting to the utmost for all that has come into his hands; and in such case every doubt will be resolved against the agent, and in favor of the principal; and if he renders an untrue account, giving a false balance, he becomes at once liable to his principal.'' (3 C.J.S., § 171, p. 61.)

"The agent's duty ordinarily includes not only the duty of stating to his principal the amount that is due, but also a duty of keeping an accurate record of the persons involved, of the dates and amounts of things received, and of payments made.'' (Rest., Second, Agency, § 382, p. 185.)

"If the principal proves or the agent admits that the agent has come into possession of money or other thing for the principal, the agent has the burden of proving that he has paid it to the principal or disposed of it in accordance with his authority.'' (*Ibid*, pp. 186-187.)

"In an action for an accounting, the agent has the burden of proving that he paid to the principal or otherwise properly disposed of the money or other thing which he is proved to have received for the principal.'' (*Ibid.*, § 399, p. 233; also see *Gilmore* v. *Gilmore*, 137 La. 162 [68 So. 395, 398]; *Lawson* v. *Burgee*, 131 Md. 436 [103 A. 516, 518]; 2 Am.Jur., § 286, p. 226; 2 Cal.Jur.2d, § 117, p. 795.)

The cited cases of *Blanchard* v. *Haig*, 57 Cal.App. 665 [207 P. 942], and *Stiller* v. *Geske*, 98 Cal.App.2d 413 [220 P.2d 437], are not to the contrary. They are clearly distinguishable upon the facts.

Cases dealing with actions for conversion (e.g., *French* v. *Robbins*, 172 Cal. 670, 679 [158 P. 188]) likewise are not controlling here. Though not cast in the form of an action for accounting, the first count of the complaint alleges the facts which created the fiduciary relationship and defendant's duty to prove the amount of his abstractions. The mere fact that it avers that defendant had ''unlawfully taken and converted and disposed of same [plaintiffs' funds] to their own use the aggregate sum of $15,000.00'' does not change the nature of the cause of action nor obligate plaintiffs to bear the burden of establishing the amount misappropriated by their faithless agent. In a contested action the court grants any relief warranted by the proof. (Code Civ. Proc., § 580.) Moreover, the third cause of action of the complaint is the common count for money had and received.

Closely allied to the rule stated in the above quotations is the proposition that ''[a]ppellants cannot complain,

however, that the loss occasioned by their wrong-doing cannot be established with complete mathematical precision. (*Stott* v. *Johnston,* 36 Cal.2d 864, 876 [229 P.2d 348, 28 A.L.R.2d 580] ; *Zinn* v. *Ex-Cell-O Corp.,* 24 Cal.2d 290, 297-298 [149 P.2d 177].) '' (*Margolis* v. *Teplin, supra,* 163 Cal. App.2d 526, 533.)

 Peculiarly pertinent here is the following language from *San Pedro Lumber Co.* v. *Reynolds,* 121 Cal. 74, 85 [53 P. 410], a case in which plaintiffs' general manager was called upon to make good certain alleged defalcations : ''Appellant's argument that plaintiff, having offered the books in evidence, is bound by them, may not be sustained. The books were offered for a two-fold purpose : 1. To show that the agent did not keep either strict or accurate accounts of his dealings with the property intrusted to him; and 2. For the distinct purpose of showing by the books, coupled with independent proof, that part of the property with the custody of which Reynolds was chargeable was not accounted for by him, and was not by him delivered to the possession of his principal. The first purpose, that is to say, the failure of the agent to keep accurate accounts, was established by the very introduction of the books. They spoke for themselves. Upon their face it could be seen and determined whether or not there were irregularities of double charges, overcharges, improper charges, or omitted charges. This did not amount to proof that the corporation had sustained loss, but it was direct proof that the agent had failed in his duty to keep by the books an accurate record or history of his dealings and transactions with the corporation's property. It is quite true that, since bookkeeping is only a history of transactions, a man does not lose money merely by faulty bookkeeping. . . . When, however, to the proof of faulty bookkeeping is added evidence from independent sources that large sums of money which would be due to the corporation under a correct statement of accounts were not in fact received by the corporation, then at once the duty is cast upon the trustee, not alone to explain the entries, but as well to account for the moneys. . . .

''Appellant admits that a large sum of money is due from Reynolds upon account of his embezzlement and improper charges. But it is insisted that the court erred in charging him with any other or greater amounts than the sum of fifteen thousand three hundred and twelve dollars and seventy-four cents. It is further said that the evidence does not show that Reynolds ever received any greater amount than that

mentioned, and it is suggested, and indeed argued, that the further sums going to make up the judgment, if lost to the corporation, were lost by the peculations of Drane, with which Reynolds was in no wise chargeable. Upon the part of the respondent it is answered that, having in view the duties of Reynolds under his trust, when it showed that he did not cause to be kept faithful and accurate accounts the duty of an accounting was cast upon him; that when it further showed that in specific instances Reynolds had defrauded and despoiled the corporation, the burden of proof shifted to him to account for every dollar of its property which had passed into his possession; that it was only necessary, therefore, for the corporation to prove that a specific amount of money had been lost; it was the duty of Reynolds to satisfactorily explain what had become of it, and, if he failed so to do, he was chargeable with it.

"This argument is certainly sound. It was not necessary for the corporation to prove that all of the money had been abstracted and embezzled by Reynolds. It was for him to show what had become of it. . . . In addition to these sums which were thus directly traced to Reynolds, it was shown by the corporation that it had not received other large sums. The evidence did not disclose what had become of these moneys. But enough had been proved to cast the burden upon Reynolds of accounting for all of this property with which he was primarily chargeable, and in any instance in which he fails he must bear the loss. This accounting he could make either by a showing that the principal in fact received the property, or admitting the loss, by establishing that it occurred through no failure upon his part to perform his duties. No such proof does defendant offer. . . . In Pomeroy's Equity Jurisprudence, section 1063, it is said: 'A failure to keep full and accurate accounts raises all presumptions against the trustee, and may subject him to pecuniary loss as for moneys received and not duly accounted for.' An affirmative duty was cast upon Reynolds to cause to be kept accurate accounts. Instead of doing this, the books were falsified under his direction and for his benefit in a great many instances, and in very many ways. Upon establishing his agency and these facts, the burden of proof shifted to him to account for all of the losses which the company by its *prima facie* case established, and in any instance where he failed to account for property he was chargeable with it or its value."

In *Frankfort etc. Co.* v. *California etc. Co.*, 28 Cal.App. 74, 86 [151 P. 176], the court quotes from *Gilbane* v. *Fidelity & Casualty Co.*, 163 F. 673, 678 [90 C.C.A. 265], as follows:

"The plaintiff having established a prima facie case by introducing the account kept by the defendants, it was incumbent upon the defendants, if they desired to show that they had not kept the account as required by the contract, but had confused other matters therewith, to point out such matters specifically. They cannot be permitted to destroy the plaintiff's claim by vaguely impeaching in general terms accounts which it was their duty to keep for the benefit of the plaintiff, .and, if there are specific items which properly should be excluded, it was the duty of the defendants to point them out specifically." (See also 3 A.L.R.2d 1310, 1316, 1363.)

Appellant did not sustain this burden. It is immaterial that remarks made by the court from time to time indicate the view that the burden was upon plaintiffs throughout. The present question is whether the evidence substantially supports the decision, not whether the judge's reasoning or his observations with respect thereto were correct.

 Appellant claims that the judgment rests primarily upon evidence which was received without proper foundation being laid, namely, the audit of the books and records made by Mr. Nelson at the request of both parties. The point is that the books themselves were not offered in evidence. However, they were present in court, subject to use and used in cross-examination and they fall within the rule expressed in *People* v. *Burman, supra*, 138 Cal.App.2d 216, 221-222: "The court did not err in permitting the accountant to testify to the results of his examination of the records which were available after defendant's flight. The records he examined were numerous. Whether he was qualified was a question for the trial court which will not be disturbed in the absence of an abuse of discretion. (*People* v. *Clark*, 117 Cal.App.2d 134, 143 [255 P.2d 79].) No abuse of that discretion is shown. There may be evidence of the contents of a writing other than the writing itself when the original consists of numerous accounts or other documents which cannot be examined in court without great loss of time and the evidence sought from them is only the general result of the whole. (Code Civ. Proc., § 1855, subd. 5.) Such was the case here." (See also *Margolis* v. *Teplin, supra*, 163 Cal.App.2d 526, 533; *Sachs* v. *Killeen*, 165 Cal.App.2d 205, 214 [331 P.2d 735];

*San Pedro Lumber Co.* v. *Reynolds, supra,* 121 Cal.App. 74, 86; *Steinberg* v. *Evans,* 20 Cal.App.2d 124, 130 [66 P.2d 712]; *People* v. *Kawano,* 38 Cal.App. 612, 614 [177 P. 174].)

Other arguments presented by counsel require no special discussion.

Judgment affirmed.

Fox, P. J., and Richards, J. pro tem.,* concurred.

*Assigned by Chairman of Judicial Council.