[Civ. No. 24873. Second Dist., Div. Three. Oct. 17, 1961.]

PARAMOUNT MANUFACTURING COMPANY (a Corporation), Appellant, v. J. E. MOHAN, Respondent.

William E. Cornell for Appellant.

Weyl & Weyl and John A. Weyl for Respondent.

FORD, J.—The plaintiff has appealed from a judgment in favor of the defendant. In its complaint, the plaintiff alleged four causes of action. The first two were based on the theory that the defendant Mohan had made false representations to the plaintiff corporation as to what his future conduct would be in the performance of his duties when he undertook employment as the manager of the plaintiff's branch office in Los Angeles. The third and fourth causes of action were founded on the theory that there had been violations of the defendant's duties to the plaintiff in the course of such employment and that the plaintiff was entitled to recover secret profits which the defendant was alleged to have made. The trial court determined that there had been no fraudulent representations and no breach of any duty on the part of Mr. Mohan and that there were no profits for which he was required to account.

The law governing the disposition of the present case has been succinctly stated as follows: ''The employee or agent may be required to account for any secret profit, gift, gratuity or benefit which he may have received in the course of the performance of his service. An employee is bound to the exercise of good faith toward his employer and cannot, without the latter's consent, retain profits or earnings received in the course of performance of the employer's business, or in an undertaking which constitutes a breach of duty

to the employer or which conflicts with his duties to his employer." (35 Am.Jur., Master and Servant, § 87; see also *Charles T. Powner Co. v. Smith*, 91 Cal.App. 101, 102 [266 P. 833].)

In reviewing the record in the light of the applicable law, this court cannot reweigh the evidence. The prevailing party's evidence must ordinarily be accepted as true and evidence which is contradictory thereof must be disregarded. (See *McCarthy* v. *Tally*, 46 Cal.2d 577, 581 [297 P.2d 981]; *Ellis* v. *Geiger*, 105 Cal.App.2d 415, 416-417 [233 P.2d 166].)

The evidence in which the determination of the trial court finds support will be stated. The main office of the plaintiff corporation was in San Francisco. Branches were maintained in Los Angeles, Portland and Seattle. The division of the business herein involved was that which sold service station equipment. The defendant Mohan was employed as a salesman by the plaintiff in 1944. In March 1949, the plaintiff's president, Miss Lattimore, talked to the defendant concerning the matter of his employment as manager of the Los Angeles branch. With respect to such conversations, Mr. Mohan testified that there was no discussion in which Miss Lattimore said that he was to handle only the plaintiff's goods; the acquisition of equipment from others as an accommodation to customers was not mentioned. Thereafter, a hand-written document bearing the date of March 19, 1949, was signed on behalf of the plaintiff by its general manager, J. W. Desmond, and by the defendant. A copy of that document is set forth in the margin of this opinion.[1]

---

[1] "March 19, 1949

Jim Mohan

Confirming our talk of this date, it is agreed that you will take over duties of Los Angeles Branch Manager, temporarily at your request, until proper man is found and employed.

During this temporary period, Paramount will pay you $500.00 per month salary plus $0.05 per mile car expense. If your direct sales under your present commission plan produce commissions in excess of $500 per month, you will be paid all commissions in excess of $500 per month.

You will work full time for Paramount hiring and developing sales personnel, arranging sales meeting [*sic*] and running all branch operations.

You have the option to stay on as branch manager, at any time prior to the appointment of permanent branch manager.

Submitted—
Paramount Mfg. Co.
/s/ J. W. Desmond

Agreed
/s/ J. E. Mohan
March 19, 1948 [1949]"

When the defendant undertook his duties as branch manager, the plaintiff had exclusive agencies for only two lines of equipment, one being for what was known as O. P. W. brass goods and the other for the Opaco brand of oil containers known as "Hi Boys." Along with other dealers, the plaintiff also sold other items of equipment. At that time, however, the plaintiff did not have a line of gasoline pumps. The defendant testified that, after his new duties commenced, he talked with Mr. Desmond about the need for pumps "to further Paramount's interest because other things that Paramount had could be sold in conjunction with the sale of the pumps." He told Mr. Desmond that he would not keep any of the money which would come from pump transactions. Such transactions could not be handled "through Paramount's books and records"; Mr. Desmond knew that "you could not buy Tokheim pumps through Paramount." Mr. Desmond gave his consent to the sale of Tokheim pumps by Mr. Mohan. At a later point in his testimony, the defendant said that in a conversation with Mr. Desmond, which he believed had occurred on March 19, the following was said: "I told him that we could sell Tokheim pumps because we did not have a pump line, that it would bring customers closer to us—— . . . That I would use the money that I did not rebate to cover any expenses in mileage, lunches, entertainment, . . . and so forth."

Mr. Desmond testified[2] that Mr. Mohan mentioned that it was difficult for him to make sales because of the small number of manufacturers represented by the plaintiff; he told Mr. Mohan that if he could sell products which were not competitive with the lines represented by the plaintiff and could thereby increase the plaintiff's sales, he "saw no reason why it should not be done." He did not tell the defendant that he could accept a commission for himself with respect to such sales. He believed that pumps were mentioned at that time. His best recollection was that this conversation occurred in the summer of 1949.

It was stipulated that in 1949 the plaintiff did not have any gasoline pumps available for sale at its Los Angeles branch. The defendant testified that the same situation existed in

[2]The testimony of Mr. Desmond was before the trial court in the form of his deposition which was read by the trial court upon the offer thereof by the defendant. The plaintiff's counsel stated that there was no objection to such course. The deposition has been transmitted to this court pursuant to rule 12 of the Rules on Appeal.

1950. He further said that he could not recall any stock of pumps being on hand in that office in 1951. His recollection was that Rapidayton pumps were stocked there for the first time in 1952. In the interim, he handled transactions involving Tokheim pumps. In some instances the Tokheim Corporation billed the customers and a commission was paid to the defendant by that corporation; such transactions covered the period of November 1949, to July of 1951, and the commissions were in the total amount of $2,662.45. No part of that amount was turned over to the plaintiff. He testified that $1,200 to $1,500 was returned to customers and the remaining amount was used for expenses in the years 1949, 1950, and 1951. In other instances, the defendant purchased Tokheim pumps in his own name; his last sale in that kind of transaction was in August 1951; there was no profit as a result of such transactions.

An agreement bearing the date of July 7, 1950, was executed by the plaintiff and The Dayton Pump and Manufacturing Company. Thereby the plaintiff was permitted to purchase Rapidayton pumps for resale. Under its terms such contract became effective on August 1, 1950, and was for a territory consisting of eight western states as well as Hawaii. One provision thereof was: ''All shipments are made and price determined f.o.b. Dayton, Ohio in carload lots of not less than fifty pumps.'' There was evidence that the plaintiff's purchases of such pumps were in the amount of $11,404.55 in July 1950, $18,949.22 in September 1950, and $20,913.75 in March 1951. However, the plaintiff's president testified that she personally sold pumps to the major oil companies and at that time such companies were having them shipped directly to their warehouses; a majority of the pumps were sold to such purchasers. She further said that she personally made 95 per cent of all sales of Rapidayton pumps. The defendant testified that when a product was in stock in the Los Angeles warehouse, he never sold the product of a competitor. With specific reference to the Rapidayton gasoline pumps, the record shows his testimony to have been as follows: ''Q. Now, to the best of your knowledge, did any of these three orders which total some roughly $50,000.00 worth of pumps ever get to the Los Angeles branch of Paramount, in July 1950 to June 1951? A. I can't remember one, sir.'' William Zimmerman, a salesman in the Los Angeles branch in 1951, testified that he sold no gasoline pumps in 1951 and that, to the best of his recollection, no such pumps were available for sale in the Los Angeles office until sometime in 1952.

Aside from the sale of gasoline pumps, the defendant engaged in transactions relating to "Hi Boys" manufactured by a company other than that which made the Opaco line which the plaintiff handled. However, the defendant testified that commencing in 1950 or 1951, because of a steel shortage, the Opaco product was not always available. He further said that during the years 1949, 1950, 1951 and 1952, there was not a constant stock of the Opaco units at the Los Angeles branch. His testimony was that his transactions with respect to the other product were undertaken "to accommodate customers who were buying other items from Paramount." He talked to Miss Lattimore about the matter at "the time they were in short supply" in 1950 or 1951. He could recall no profit from the sales of such "Hi Boys." He said that, with respect to the "Hi Boys," Miss Lattimore never told him that any money received in such transactions should "go through Paramount's books." At one time, "because of a scarcity," he bought a number of "Hi Boys" and stored them in a private garage; he believed that the number so stored was forty. He resold them for the same price or less; he thought that the majority were sold to Myers Bros. As to such stored equipment, he testified: "A. If I recall correctly those Hi Boys set there in that garage for over a year because some Hi Boys became available again; and I believe they sat there for over a year, and I finally sold them. I think it's something like that. Q. When they became available again you mean the Opaco line became available? A. Yes, sir. Q. And you sold these forty in the Perez garage about a year after that, after the Opaco line was available, is that correct? A. Sometimes they were available; sometimes they were not, that's right." During the period of 1949 to October 1954 (the month in which the defendant voluntarily terminated his employment), the number of "Hi Boys" which he purchased could have been about 100 or 125.

The evidence which has been summarized was sufficient to justify the conclusion that the defendant's transactions were for the purpose of stimulating sales of the plaintiff's goods which could be moved more readily if other items, not currently in stock, could also be obtained for customers. The trier of fact was free to draw the inference that the activities of the defendant were consistent with his duty of loyalty to the plaintiff and caused it no loss. Consequently, the determination of the trial court must stand unless one further

contention, about to be considered, is of such merit as to require a contrary conclusion.

■ The position of the plaintiff appears to be that the burden was on the defendant to explain the source of *every* substantial amount of money which came into his possession during the period of his employment, so as to show whether it arose out of his employment and whether it belonged to his employer or to him, and that upon his failure to do so the plaintiff became entitled to judgment for any amounts unexplained. The defendant did identify a number of items as arising from transactions entirely unrelated to his employment. But, as conceded by the defendant in his brief, there were a number of deposits that appeared in the records of his personal bank account as to which he, after a period of years, "could not pinpoint the source of such funds." The trial court was, of course, warranted in considering the failure of the defendant to explain particular items insofar as such failure bore upon the weight to be given to his testimony and the inferences to be drawn therefrom as to the propriety of his conduct in the service of the plaintiff.[3] But, upon substantial evidence, the trial court determined that there had been no transaction upon the part of the defendant as an employee which constituted a misapplication of funds belonging to the plaintiff or other breach of his duty to his employer. Such determination precluded the placing of any burden on the defendant to account as to funds received by him with respect to which the plaintiff had not shown that it had a right of any kind. (See *Kennard* v. *Glick,* 183 Cal.App.2d 246, 251 [7 Cal.Rptr. 88].)

The judgment is affirmed.

Shinn, P. J., and Vallée, J., concurred.