Statement of the Case.
MONROE, J.
Plaintiff alleges that his father, who was about 85 years of age, owned certain land in Terrebonne parish, which, for many years, has been cultivated as a plantation; that on August 24, 1905, he made a pretended conveyance of it, being all the property that he possessed, to his three sons, Alcide, Harry, and Ryle, retaining the usufruct for his life, the recited consideration being $9,701.88; that the conveyance was without consideration, was a fraudulent simulation and disguised donation, brought about by the undue influence of the so-called purchasers on petitioners’ father, who was then in a very feeble condition, and bedridden by his last illness, which terminated in his death a few days afterwards; that no money passed between the parties, and there was no change of possession; and that the property in question belongs to the estate of his father. Ha alleges, in the alternative, that, should it be found that there was some consideration moving to his father in said transaction, it was much below the fair value of the property, and the transaction is obnoxious to the objection that it was intended, and will operate, to deprive petitioner of his equal share in his father’s estate. He further alleges that he was absent from the state when his father died and has learned of that event only within the past few months; that he has demanded a settlement from defendants, but in vain. He prays that the parties named be cited, and for judgment decreeing the conveyance in question to be a simulation and without consideration; that the property be decreed to belong to the estate of his father; and that he be recognized and put in possession as owner of an undivided one-fourth thereof; or, should the court find that there was some consideration, that the nature and extent thereof be determined; and that defendants be ordered to collate to the extent necessary to satisfy petitioners’ just demands; and, for that purpose, that an inventory and partition be ordered. And he prays1 for costs and general relief.
There was an exception, of “no right or cause of action” interposed, and overruled-Defendants then answered alleging that the conveyance was made in good faith and for a sound price and was accepted by them at the earnest solicitation of their father, who was in full possession of his mental faculties.
The facts, as they appear from, the transcript, are as follows: Each of the four sons had inherited from their mother (subject, as we understand it, to the usufruct of their father) the sum of $1,564, and plaintiff had been paid, and had left the paternal home, some ten years, or more, prior to the transaction out of which this litigation arises, and was then, and, later (when his father died), living in Texas, but the defendants had *411 not been paid, and had lived and worked upon the plantation; Alcide, the elder, occupy-: ing the position of manager, under his father’s control. That being the situation, and the father being then about 84 years of age, and, as it proved, on his deathbed, an attorney at law was, on August 24, 1905, called upon by Alcide; who told him that his father wanted him to come and pass an act of sale from him to his three sons, Alcide, Harry, and Ryle, and the attorney called on the father, at his home, on the same day. He found him in bed, but with his clothing on, and able to sit up in bed, though requiring assistance in order to assume or maintain, as we understand, a sitting position, and he was informed by him that he was indebted to his three sons (there present) for their interest in their mother’s estate; that he had been compelled to get them to waive their mortgage in order to enable him to borrow the money needed for the operation of the plantation, for which purpose he had imposed upon the property a mortgage which primed theirs; that he felt sure that he would not be able to pay them; and that he wanted to deed the plantation to them and wanted them to assume the debt then resting on it, and to work the place out, and pay themselves. The attorney, thereupon, prepared an act, in the form of a sale, whereby the property was conveyed to the defendants, which act was duly signed, witnessed, and recorded, all on the same day.
The act conveys a tract of land having a frontage of 12% arpents on Bayou Dularge, left bank, and an undivided half interest in another tract, with like frontage, on the right bank of the bayou, together with all the improvements, mules, carts, cattle, implements, etc., belonging to the grantor, and it also conveys “the growing crops of cane, corn and other products” on both tracts.
“The vendor reserves for himself the usufruct of the property * * * during his natural life.” The consideration is expressed as follows:
“This present sale and transfer is made and accepted for and in' consideration of the price and sum of $9,701.38, to be paid and liquidated as follows, to wit:
“(1) The sum of $500 is paid in; ready cash.
“(2) The sum of $4,694.73 is paid, cash, and liquidated by a receipt given by said purchasers to the vendor for said amount, the same being a full and complete settlement between said vendor and vendees for the latter’s interest in the succession of their deceased mother. * * *
“(3) The assumpsit, by said purchasers, of a certain promissory note, dated July 18, 1903, drawn and executed by said vendor and by him indorsed in blank, for the sum of $4,000, due and payable on the 1st day of January, 1904, with 8 per cent, per annum interest from maturity until paid, and secured by special mortgage on the property herein sold, said note aggregating, principal and interest, this day, the sum of $4,506.65. * * *
“The purchasers as a further consideration of this sale hereby assume to pay the taxes upon the property herein sold for the current year.”
It is admitted that there was no cash paid; Alcide, the -only one of the defendants who appeared as a witness, testifying as follows in regard to the “cash” item of $500, to wit:
“We were supposed to pay for his illness, doctor, medicine, etc., but we didn’t spend the $500. We spent about — I have not got it here — but in the neighborhood of $S0 or $90.”
The $4,694.73 represents the amount ($1,-564.91 x 3 = $4,694.73) due the vendees as heirs of their mother. As to the item of $4,-506.05, it appears that on January 1, 1905, there was outstanding (in the hands of a corporation, or partnership, doing business in the name of the Argyle Planting & Manufacturing Company) a note which had been given by P. A. Champagne (father of the litigants) for advances and supplies, and upon which there was due a balance of $2,809.35. By September 1,1905, that debt had increased, by reason of advances and supplies obtained for the making of the crop of that year, to $4,502.27. The figures ($4,506.65) appearing in the act seem, therefore, to be slightly erroneous, the utmost that was due on August 24, 1905, being the $4,502.27, which the book *413 keeper of Argyle, etc., Co. testifies to as the amount of the debt on September 1, 1905. In that connection, the undisputed evidence shows that (apart from corn and other things that may have been produced) the cane crop of 1905 amounted to 2,195 tons and was sold to the Argyle Company for $6,200.75. Concerning the condition of the crop on August 24th, and the expense of making it, F. A. Bonvillain, president and general manager of the company by which the advances were made, testifying as a witness for defendants, says:
“All of the expenses are made before August 24th. There is no expense after that, except to harvest the crop, and that is very insignificant until you start grinding. You don’t require much labor to run from August to the time you go to saving the crop of cane. Q. In other words, the crop is ‘laid by’ at that time? A. Yes, sir.”
Prom other testimony given by the witness and by John Le Blanc (who also acted as manager and bookkeeper of the Argyle Company) we gather that the expense of cutting, handling, and saving the crop in question amounted to $1,100, from which it follows that the proceeds of the crop ($0,200.75) were sufficient to pay a debt of the previous year together with the expense of making the crop (of 1905) and to leave a balance of, say, $598.48.
In other words, the profit on the cane crop of 1905 is represented by the amount of the pre-existing debt ($2,809.35), which was, or might have been, paid from the proceeds, plus the balance (of $598.48) which was left, after paying that debt together with the expense of making and saving the crop, or, say, $3,-407.83. It is true that Mr. Le Blanc testifies, at one time, that they (defendants) came out $1,579.59 behind that year, and, at another time, that they made a profit of $1,300 or $1,-400. But he also testified that the place owed $2,809.35 on January 1st; that on September 1st the debt was $4,502.27, which amount included the $2,809.35; that the cane was sold for $6,200.75; and that it cost $1,100 to save the crop, after it was laid by — from which it-appears to us that $1,692.92 ($4,502.27 — $2,-809.35 = $1,692.92) was used in making and laying by the crop, to which, add $1,100, the cost of saving it, and the total cost of making and saving is ($1,692.92 + 1,100 = $2,792.92) $2,792.92; and, deducting that amount from the proceeds of the crop ($6,200.75 — $2,792.-92 = $3,407.S3), and we have the figures at which we have arrived. It may be remarked, in this connection, that Alcide Champagne is exceedingly reticent upon the subject and testifies that he does not know how much the crop sold for or how much profit was made.
The act of sale in question recites that the vendor “declared that he knew how to write and sign his name, but, owing to sickness and physical infirmities, he is unable to write or sign his name,” and he therefore made his mark, or touched the pen. Shortly after-wards, on September 10th, he died, leaving no property, so far as appears; and, a little more than a year and a half later, one of the defendants wrote to the plaintiff, who was living in Texas, and informed him of the fact, that being the first information he had received upon the subject. On February 18, 1907, plaintiff instituted this suit.
There is considerable testimony in the record upon the subject of the value of the plantation. The improvements are all on that portion (12% arpents front) which lies upon the left bank of the bayou, and there is also upon that side a swamp containing 820,000 feet of cypress timber, worth, as we take it, $5 per M, or, say, $4,100. The tract (12% arpents front) lying on the right bank of the bayou is owned in indivisión with Aurelie Theriot, who, at one time, also owned the property on the left bank, in indivisión with P. A. Champagne, until there was a partition (of the property on that side), and now owns, as his share of the original tract, the place adjoining the one here in question. Mr. *415 Theriot testifies that, in his opinion, the Champagne place, with the improvements, live stock, implements, and timber, including both sides of the bayou, but not including the crop, was worth, in August, 1905, $16,000.
Emile Marmande, who lives about a mile' away, but owns property adjoining, thinks the place was worth $14,000, in 1905, without the crop, and is worth more now. Whether he intended to include the timber is hard to say. He says that he has been offered $5 per 1,000 for the timber on his place, and he thinks • the timber on the Champagne place is larger. There is, however, much more (about 10,000,000 feet) on his place. T. E. Wright, the assessor of the parish, values the land, mules, and implements constituting the Champagne place at $10,000, or $12,000, and says that the place was assessed in 1905 at $3,200, which was, or was intended to be, about one-fourth its worth. F. A. Bouvillain puts the value, exclusive of the timber or crop, at $10,000 or $12,000. Lee Cook thinks the value, “including the swamp,” is $13,000. Albert Aucoin testifies to about the same effect. Upon the case as thus presented, the learned judge of the district court, giving his reasons in an able opinion, reached the conclusion that the transaction here attacked was a bona fide sale, made without fraudulent intent, the consideration for which he states as follows:
(1) Amount paid for last illness.....$ 80 00
(2) Due from succession of mother. .. 4,694 73
(3) Mortgage debt, assumed — Amt due Aug. 24.................. 4,502 27
Total consideration paid........$9,277 00
He further concluded that the property involved in the transaction was worth $15,000, and that $9,277 was a low price, and hence that defendant should be ordered to collate. And he ■ gave judgment recognizing the defendants as the owners of the property, subject to the obligation to collate, and, in the event of their making the collation in kind, recognizing them as entitled to be paid, by preference, in the partition or from the proceeds, said sum of $9,277; all the litigants to share equally in the excess over that amount. He further decreed that, should defendants ele.ct, within 30 days, to collate, by taking less, their right to retain the property in question be recognized on- their paying plaintiff his share of the excess, or, say, $1,430.75, with interest from judicial demand. And defendants were ordered to pay the costs. From the judgment so rendered, defendants have appealed, and plaintiff has answered the appeal, praying:
“That there be judgment in favor of George J. Champagne decreeing the sale made by P. A. Champagne null and void, for lesion, and, in the alternative, that said judgment be affirmed.”
Opinion.
There is no suggestion in the petition that the sale here attacked should, or could, be set aside for “lesion,” and that word does not appear to have been mentioned in the district court. Whatever, therefore, may have been the original possibility, the action cannot, at1 this time, be converted into, or dealt with as, an action to avoid a sale for lesion; and, so -far as plaintiff is concerned, the prayer contained in his answer to the appeal leaves only the alternative of affirming the judgment of the district court. Counsel for defendants say in their brief:
“Defendants pleaded the prescription of one year, * * * and alleged the validity of the sale. The plea of prescription, filed as an exception, was overruled, because of the allegation of simulation; but, on the trial, although the charge of simulation was rejected by the decree, the plea of prescription did not, in the opinion of the trial judge, protect defendants against plaintiff’s claim for collation. This was a manifest error. After the rendition of the judgment, defendants renewed the plea of prescription of one year to the decree of the court, and moved for a new trial, which plea and motion were overruled.”
Counsel seem, however, to have confused their pleadings with their argument, as we find no prescription pleaded, prior to the *417 judgment, and the judge a quo, in his reasons for overruling the exception of “no cause and no right of action,” mentions the fact that some such point was presented in argument, and, in declining to rule on it, or to rule, specifically, on the alternative prayer of the petition, said:
“The petition is framed with the very evident intention of setting forth a cause of action under articles 1246 and 124S, Civ. Code, wherein undue advantage is taken of a forced heir.”
On the day after the judgment of the district court had been rendered, and after the. motion fór a new trial had been filed, defendants filed a plea, reading, in part, as follows:
“Now into court come the defendants, * * * who show the court that their father died on the, 10th day of September, 1905, and that the suit herein instituted * * * was filed on the 18th day of February, 1907; that the judgment herein rendered, on the 16th (should be 26th) day of April, 1908, maintains the sale, * * * but declares that the price paid was less than the value of the property sold, and orders the defendants to collate to the succession of their father the difference between the price paid and the estimated value of the plantation. To this decree the defendants now plead the prescription of one year — more than that time having elapsed between the date of the death of their father and the date of the filing of plaintiff’s action herein.”
No action appears to have been taken upon this plea by the judge a quo, and defendants’ counsel now say:
“As against any suit for rescission or reduction, we insist on urging our plea of prescription of one year.”
Tbe only plea of prescription, however, that we find in tbe record, is that wbieb we liave quoted, and which is, in terms, leveled, not at tbe suit, but at the “decree,” which bad been entered only tbe day before, and which, by reason of tbe appeal, is not yet final. If we could assume that it was intended to be leveled at tbe suit, we agree with tbe learned judge a quo that this is essentially a suit on the part of one heir to compel his coheirs to collate with respect to an advantage, which they are said to have received from the common ancestor (whose succession has never been opened or settled) in excess of what he intended and of what, in tbe absence of such expressed intention,, the law allows, and we are referred to no law, and know of none, by which such a suit is barred by the prescription of one yeai from the date of the death of the ancestor from whom the parties inherit. We now proceed to consider, more particularly, the character of the transaction which is here attacked and of the relief sought. The learned leading counsel for defendants (being tbe same “attorney” by whom the act of conveyance in question was prepared), in the perfectly straightforward statement, made by him as a witness, said that, having gone to tbe Champagne residence at the request of Mr. Alcide Champagne, be found’ “old Mr. Champagne in bed,” etc., and he proceeds:
“He explained to me that he had taken possession of the estate of his four minor children, upon the death of tlieir mother, and that he owed each one of them. I think the amount was something like $1,600; that is, also, his. son, George whom he had settled with. And that, in order to get advances from Argyle Planting & Manufacturing Company, he had been compelled to have his three sons, after their majority, waive their minor’s mortgage against him; and that, in view of tlie fact that he was getting pretty old, he didn’t think he could live to work out his indebtedness on the property, which primed his children’s claim against him, (and) he wanted to deed his plantation to his three sons, to whom he owed this money from their mother’s estate, and he wanted them to assume the indebtedness and pay tire Argyle Planting & Manufacturing Company and work the place out and pay. themselves; He felt sure he would not be able to pay them.”
This testimony is wholly unimpeached and uncontradicted, and we find nothing in tbe record that suggests tbe idea that the old man bad any other purpose in view than that which be thus declared, to wit, to make such disposition of his property as would secure tbe payment of the debt due to bis three sons, and (by reservation of tbe usufruct of tbe property) secure bis own maintenance during *419 the few remaining days of his life. There is no indication that, so far as he was concerned, he intended to prefer the three sons in whose behalf he executed the act in question, or to give them any advantage over their absent brother; and, if he had so intended, it would have been necessary, for the accomplishment of such purpose, that he should have so declared in unequivocal terms, since equality between heirs of the same degree is the cardinal principle of the law, and, in order that it may be secured, “collation is always presumed, where it has not been expressly forbidden.” Whatever is given by a father to a child is presumed to have been so given as in advance of the portion which the child may one day expect to receive from the succession, and that portion, under • the law, and in the absence of express declaration of the parent to the contrary, can be no greater than the portion of his brother; hence what has been so received must be collated or accounted for in the partition of the inheritance. Civ. Code, arts. 1229, 1230, 1231, 1232, 1233.
Nor does it make any difference whether the advantage which a child has received has come to him directly or indirectly, by donation, pure and simple, by donation disguised as a sale, by a sale for an inadequate price, or otherwise. Article 1248 of the Code provides that:
“The advantage which a father bestows upon his son, though in any other manner than by a donation or legacy, is likewise subject to collation. Thus, when a father has sold a thing to his son for a very low price, or has paid for him the price of some purchase, or has spent money to improve his son’s estate, all that is subject to collation.”
In Laycock v. Bird, 13 La. Ann. 173, the ■court found that the property, the sale of which was attacked for lesion and as a disguised donation, had been sold by the mother to one of the children “at a very low price,” though exceeding one-half the value, and, that the transaction was a real one; and it held that there was no lesion and no donation in disguise, and that plaintiff’s remedy was by an application, under Civ. Code, arts. 1246, 1248, “to have her coheir collate, when a partition takes place.”
In Montgomery v. Chaney, 13 La. Ann. 207, the court, after quoting article 2419 (now 2444), to the effect that sales made by parents to children may be attacked by forced heirs, if the latter can show them to have been disguised donations, or that the price was below one-fourth of the real value of the immovable sold, said:
“The foregoing article is a legislative recognition of the right to institute such action as the present. And, even where there is a price actually paid, exceeding one-fourth the value of the property sold, but, much below its fair value, and an advantage is thus, - indirectly, sought to be given one lieir over others, the law searches it out and compels the heirs to stand upon an equal footing. * * * The true-questions are: Was the sale in question a real sale, and was a fair price, at the time, actually paid ? If those questions, or either of them, are answered in the negative, collation is due by the protended vendee, or the property comes into the mass to be distributed according to the rules laid down in the Code upon the subject of partition, unless it be found that the deceased declared the same to be intended as an advantage, in the manner already indicated.”
See, also, Dupuy v. Dupont, 11 La. Ann. 226; Clark v. Hedden, 109 La. 147, 33 South. 116; Succession of Weber, 110 La. 674, 34 South. 731.
In the instant case, then, the questions are: Was the alleged sale a real one, and was the alleged price a fair one, at that time? We answer the first by saying that the real nature of the transaction seems to have been that of a giving in payment, and that it was a real conveyance, though it does not' appear to us that the donor intended to do more than pay his debt to the donees and did not realize that he was doing more. The other question, we answer, unhesitatingly, in the-negative. Plaintiff, by his answer to the appeal, has cut off any change in the judgment for his benefit, unless we could hold the case to be one of lesion, which, for the reasons. *421 already stated, we cannot do. Counsel for defendants argue that the consideration was a fair one, and we are unable to agree with them. The learned judge a quo found that it was unfair to the extent of, say, $5,723, and, as we are satisfied that his conclusion works no prejudice to the defendants, the judgment cannot be amended for their benefit.
The judgment appealed from is, accordingly, affirmed.