339 So.2d 1337 (1976)
Succession of Martha Louise Hunter PIERSON (Pattie Hunter Pierson).
No. 5489.
Court of Appeal of Louisiana, Third Circuit.
November 19, 1976.
Rehearings Denied December 15, 1976.[*]
Writs Refused February 11, 1977.
*1339 Lewis O. Lauve, Alexandria, for defendant-appellant, David Pierson.
Pharis & Pharis by F. Jean Pharis, Alexandria, for defendant-appellant.
*1340 Alfred A. Mansour, Alexandria, William J. Guste, Jr., Atty. Gen., New Orleans, for Louise Pierson Marshall.
Bolen, Halcomb, Bolton & Erwin by James A. Bolen, Jr., Alexandria, for plaintiff-appellant, Diane P. Whaley.
Gist, Methvin & Trimble by John W. Munsterman, Alexandria, for Security National Bank.
Provosty & Sadler by Richard E. Chaudoir, Alexandria, for Guaranty Bank & Trust Co.
Before HOOD, DOMENGEAUX and PAVY, JJ.
PAVY, Judge.
Mrs. Martha Louise Hunter Pierson, widow of Dr. Clarence Pierson, Sr., died in February, 1971, leaving as her heirs at law two sons, Hunter Pierson and David Pierson, a daughter, Mrs. Louise Pierson Marshall, and a granddaughter, Mrs. Diane Pierson Whaley, the child of Clarence Pierson, Jr., a predeceased son. She left a will bequeathing the disposable portion of her estate to Hunter Pierson and additionally leaving minor or sentimental items to several parties. The will was duly probated and Security National Bank of Alexandria eventually named executor. Mrs. Whaley and Mrs. Marshall each filed petitions against both David Pierson and Hunter Pierson in the estate proceedings to compel reduction and collation of numerous donations including those contained in the will. Both these defendants answered and reconvened to compel Mrs. Marshall and Mrs. Whaley to collate certain inter vivos donations. Hunter Pierson died and his executor, Mrs. Anne Pierson Patten, a daughter, was substituted as a party litigant in his place.
After a lengthy trial of several days involving voluminous documentary evidence, the trial judge rendered reasons for judgment in which he found that no collation was due by the Estate of Hunter Pierson, that David Pierson was obligated to collate in the sum of $23,487.32, that Mrs. Marshall was obligated to collate in the sum of $21,031 and Mrs. Whaley was obligated to collate in the sum of $1,184. The question of computing the value of the estate for reduction purposes was deferred to further proceedings by the succession representative. All parties have appealed from a judgment in conformity with the reasons for judgment.
Dr. Clarence Pierson, Sr., decedent's husband, died in 1934. His estate was substantial but not very liquid and a large portion of it was sold to pay debts. Mrs. Pierson purchased a 30-acre tract at the succession sale. This land was developed into Mimosa Place Subdivision, a choice residential area in Alexandria. By sale of lots in this subdivision from the late thirties until her death in 1971, Mrs. Pierson sustained herself and accumulated an estate which was inventoried at a gross figure of $144,000. Over the years certain residual assets of Dr. Pierson's estate were sold nonjudicially and these proceeds along with dividends and other income was distributed to the heirs.
At the time of Dr. Pierson's death in 1934, Hunter was 11 years of age and Clarence, Jr., David and Louise were all of age. Hunter completed his law studies in 1947 and returned to Alexandria where he lived throughout his mother's life. David worked around Alexandria until World War II in which he served and after which he worked in New Orleans until 1956 when he returned to Alexandria and remained there until his mother's death. Clarence, Jr. lived around Alexandria until his death in 1951, and his daughter, Mrs. Whaley, continued to reside in Alexandria throughout her grandmother's life. Mrs. Marshall moved to New Orleans in 1954 or 1955 and continued to reside there throughout her mother's life.
In Louisiana, equality between heirs of the same degree is the cardinal principle of our law of inheritance, and, in order that it may be secured, "collation is always presumed, where it has not been expressly forbidden." Whatever is given by a father to a child is presumed to have been given as in advance of the portion which the child may, one day, expect to *1341 receive from the succession, and that portion, in the absence of express declaration of the parent to the contrary can be no greater than the portion of another heir in the same degree; hence what has been so received must be collated or accounted for, in the partition of the inheritance. Nor does it make any difference whether the advantage which a child has received has come to him directly or indirectly, by donation pure and simple, by donation disguised as a sale, by a sale for an inadequate price, or otherwise; every such advantage, not unequivocally given as an advantage, is subject to collation.
The claims for collation cover a period from shortly after Dr. Pierson's death in 1934 until Mrs. Pierson's death in 1971. In many instances the evidence as to a particular transaction is incomplete although it is apparent that, in most instances, the parties did place in the record everything of probative value which was available. There are a total of twenty claims for collation urged between all the parties. Some are easily disposed of as obviously either meritorious or without merit. Others present serious questions of fact or law. We will now proceed to consider these individually.
A claim for collation was made against Mrs. Louise Pierson Marshall for money gifts from her mother in the amount of $1,015.48. In support of this claim, there were filed in evidence twelve checks issued by decedent, all but one to Mrs. Marshall, all during the years 1937 to 1939 and totalling $1,207. Additionally, there was filed in evidence a receipt from Mrs. Marshall to decedent dated May 19, 1939 (none of the checks filed in evidence were dated subsequent to that date) totalling $1,015.48. This receipt listed checks totalling that amount. All the checks listed in the receipt are among those filed in evidence. None of the checks filed in evidence bear any notation necessarily indicating that they were not gifts or loans. All are in rounded dollar amounts except one for $51.48 which is in favor of "The Smart Shoppe" and which bears the indication that it was in payment of Mrs. Marshall's account with that payee. Mrs. Marshall thought that many of the checks filed in evidence as well as others shown on a list which she had prepared could probably be explained as other than gifts or loans to her. She was unable to be express or specific except that she thought one of the checks filed in evidence and listed on the receipt represented a payment due her by her mother for shrubbery. However, this check was given in 1938 and she (Mrs. Marshall) receipted for it or signed the receipt listing it in 1939. Mrs. Marshall's list of checks in her favor show some with definite notations that they were purposes other than gifts or loans. However, none of those listed in the receipt and filed in evidence as making up the $1,015.48 for which Mrs. Marshall receipted show any notation that they were for anything other than gifts or loans. Whether these checks represented gifts or loans is immaterial for debts are as much collatable as gifts. See 34 La.Law Review 782. We cannot imagine why the parties would have reduced to writing their understanding as to what had been received by Mrs. Marshall from her mother except to show the total loaned or advanced by the decedent. Accordingly, we conclude that there is sufficient proof to establish a collatable claim of $1,015.48 against Mrs. Marshall.
A claim for collation was made against Mrs. Marshall for the value of Lot 3, Block 5 of Mimosa Place, the subdivision developed by Mrs. Pierson. The records show a $1,000 cash sale to her by decedent in 1940. Mrs. Marshall admits no money was paid for the property but claims that she took it in fulfillment of a special bequest of $1,000 left to her by her father, which bequest she claims to have not otherwise received. In a deposition, Hunter Pierson claims that he had a receipt from her for the $1,000. An undated receipt for the $1,000 bequest is filed of record.
In her testament, decedent stated that the lot was a gift to Mrs. Marshall and should be collated. In a letter to her heirs accompanying her will and explanatory of her actions with regard to the settling of Dr. Pierson's estate and her financial affairs *1342 in subsequent years, decedent stated that the $1,000 bequest to Mrs. Marshall had been paid out of life insurance proceeds payable to decedent. In the letter, she stated the lot was donated to Mrs. Marshall. The trial judge concluded that there was not sufficient proof to show that the payment of the $1,000 bequest served as consideration of the transfer. We cannot say he committed manifest error.
This lot was appraised at $21,031 at the time of the opening of the succession and the trial judge held that amount was subject to collation. See Civil Code Article 1270. However, we note that plaintiffs in reconvention (David and the Estate of Hunter Pierson) sought collation for this item in the amount of $15,000 only. The amount of collation must be restricted to that figure. We think the rule restricting recovery to the amount prayed for is applicable here. In Friedman Iron & Supply Co. v. Beaird Co., Inc., 222 La. 627, 63 So.2d 144 (1953) the court stated:
"Taking up these points in the order just presented, regarding the first it is hardly necessary to have to state that a plaintiff cannot recover a greater amount than what he prays for. That is elementary. . .
Neither is there any merit to the contention that the pleadings have been enlarged by the admission of unobjected to testimony. The rule on this point, as stated in City of Shreveport v. Chatwin, 139 La. 531, 71 So. 791, 792, is that "evidence received without objection enlarges pleadings only when it would not have been admissible if objected to". That rule governs this case as certainly evidence regarding the Pittsburg market, less freight, was admissible even over objection, to show market value as of March 9, 1949, the date of breach.
We are convinced that plaintiff, if entitled to damages, is limited to the amount of $6,360 as prayed for in its supplemental petition."
Counsel for Mrs. Marshall argues that the amount of collation should be the sale price of the lot which she received in selling it shortly after the transfer to her. For this contention she relies on Civil Code Article 1271. Civil Code Articles 1270 and 1271 provide:
"Art. 1270. If the donee has voluntarily alienated the immovable property which has been given him as an advantage or extra portion, if he has permitted it to be seized and sold for the payment of his debts, or if it has been destroyed by his fault or negligence, he shall not be the less bound to make the collation of it, according to the value which the immovable would have had at the time of the opening of the succession, deducting expenses, as is provided in the foregoing article.
Art. 1271. But if the donee has been forced to alienate the immovable property, he shall be obliged to collate by taking less the price he has received from this sale and no more.
As, for example, if the donee shall be obliged to submit to a sale of the immovable for some object of public utility, or to discharge a mortgage imposed by the donor, or because the immovable was held in common with another person who has prayed for the sale in order to obtain a partition of it."
The argument is made that Mrs. Marshall was forced to alienate the property because she was financially strapped, could do nothing with the lot and needed funds with which to start a business to support her family. The evidence does indeed reveal that she sold the lot because of her financial condition. However, we cannot construe the codal articles as contended for by counsel. Article 1270 clearly applies to this situation as a voluntary alienation. Article 1271 contemplates a legally, not economically, forced sale. We agree with the trial court's ruling that the collatable amount is not restricted to the price for which Mrs. Marshall sold the property.
Another claim for collation is that of $1,184.80 by Mrs. Whaley representing the amount of the funeral bill of her father, Clarence Pierson, Jr., which was paid by decedent. The trial judge recognized it.
*1343 The widow has acknowledged the payment and the records of the funeral home verify it.
The check for payment of the funeral bill was not in evidence. Most of Mrs. Pierson's checks during this period were not available. Counsel for Mrs. Whaley argues the proof was insufficient that the payment by decedent was from her own funds and suggests that it may have come from monies of Dr. Pierson's estate or monies of Clarence, Jr. that were under the control of decedent.
Clarence, Jr. died in 1951. In the late thirties, a final account was rendered in Dr. Pierson's estate showing each heir was due the sum of $319.12. These sums were receipted for by all the children long prior to Clarence's death. We are unable to understand how there could have been funds from the father's estate still available in 1951. Although some property of the estate was sold nonjudicially after the final account, the evidence generally shows that these funds were distributed to the heirs upon the occasion of each sale.
In 1947 Clarence, Jr. was seriously injured and recuperated at his mother's home. She handled some of his financial affairs during this time. In 1948, he issued a check to her for $5,000. Counsel suggests the funeral bill payment may have come from that source. The evidence shows that Clarence had considerable expenses in connection with his injury. He recovered and lived until late 1951. It is difficult to imagine how decedent still had some of this money after that length of time. The burden of proof does not require negation of a mere theoretical possibility.
Argument is further made that collation is not due on this item because there could have been no donation inter vivos in favor of a deceased person. Collation is due regardless of the form or manner by which the advantage to the descendant occurs. The law expressly states that it need not be in the form of a donation. See Civil Code Article 1248. Many collations arise from transactions or situations not involving a donation between living persons. We think the payment of this funeral expense was an advantage to Clarence's estate or his daughter, Mrs. Whaley, and she should be made to collate the amount of it.
A claim was made for collation by Mrs. Whaley of the value of Lot 1 of Block 7 of Mimosa Place. In 1939, this property (part of that acquired by decedent at successional sale) was transferred by her to Mrs. Whaley's father, Clarence Pierson, Jr.. This was in the form of a cash sale for the recited consideration of $2,000. Mrs. Maxine Cole Pierson, widow of Clarence Pierson, Jr., testified that her husband actually gave no money in the transaction. It was her understanding that he had given up $2,000 of his share in the estate of Dr. Clarence Pierson. That estate was closed out in June, 1938 with a final account by the succession representative and a judgment of possession of $13,000 worth of property including some lots, corporate stock and cash of $2,552.96. There is in evidence a receipt by Clarence Pierson, Jr., dated August 29, 1938 for $319.12 being one-eighth of the cash remaining. David Pierson stated that the transaction was a donation. In her last will and testament and the letter accompanying it, decedent stated that the property was donated to Clarence Jr. In those same two documents, she acknowledged the gift of a lot to Mrs. Marshall, previously mentioned, and the gift of a lot to David Pierson which will be discussed later.
The trial judge resolved the issue by resort to the burden of proof, holding that the evidence was not sufficient to show a donation.
Pertinent here are the provisions of Civil Code Articles 2239 and 2444 which provide:
"Art. 2239. Counter letters can have no effect against creditors or bona fide purchasers; they are valid as to all others; but forced heirs shall have the same right to annul absolutely and by parol evidence the simulated contracts of those from whom they inherit, and shall not be restricted to the legitimate [legitime].
Art. 2444. The sales of immovable property made by parents to their children *1344 may be attacked by the forced heirs, as containing a donation in disguise if the latter can prove that no price has been paid, or that the price was below one-fourth of the real value of the immovable sold, at the time of the sale."
In Laborde v. Dauzat, 158 So.2d 637 (La. App. 3rd Cir. 1963), the rule as to the burden of proof in these situations was set out as follows:
"The law provides that forced heirs have the right to annul absolutely and by parol evidence the simulated contracts of those from whom they inherit. LSA-C.C. Article 2239. In an action attacking an authentic act as being a simulation, the burden of proof rests primarily upon the party making the attack, to establish the facts upon which the alleged invalidity is based. If one alleging a simulation, however, produces evidence of circumstances which creates highly reasonable doubts or suspicions as to the honesty of the transaction, a prima facie case is considered as having been made out and the burden of proof is shifted to the party relying on the validity of that transaction to show that it was valid. Burch v. Nichols, La. App. 3 Cir., 126 So.2d 713; Broussard v. Broussard, La.App. 2 Cir., 132 So.2d 85; Landry v. Landry, La.App. 3 Cir., 140 So.2d 706 (cert. denied); Luquette v. Floyd, La.App. 3rd Cir., 147 So.2d 894 (cert. denied)."
We are particularly struck with a peculiarity of this case. Unlike the usual situation, here the parent-transferor did not remain silent as to the true nature of the transaction. We are not dealing with fraud on her part or that of her son. Neither are we confronted with sworn testimony by the transferee that a real consideration was given. It is common knowledge that, for title reasons, attorneys use cash sales to effect donations. Confusion could have very easily existed as to the difference between a share in Dr. Pierson's estate and an advance on the inheritance in Mrs. Pierson's estate. Upon considering all the facts and circumstances, we think that a prima facie case is made out that no consideration was given and the burden to prove the contrary has not been discharged. Therefore, Mrs. Whaley must collate the value of this item. The realtor appraised it at $36,065 but in accordance with our previous ruling restricting collation to the amount sought in the petition, the collation for this item is set at $20,000.
The record reveals decedent paid the Veterans Administration a considerable sum as premiums on David's National Service Life Insurance policy which he had obtained as a serviceman in World War II. This was a term policy with no cash value. In rejecting the claim for collation of these sums by David, the court stated:
"David had dropped the policy and Mrs. Pierson commenced paying the premiums and she was the beneficiary. Mrs. Pierson was the only one that stood to benefit under this life insurance policy. David by no stretch of the imagination could ever have benefited by this insurance policy. In actuality, Mrs. Pierson never benefited by this policy as she predeceased David. These monies were not paid to David but were paid to the Veterans Administration and Mrs. Pierson paid those because she stood to profit by these premium payments. This was a speculative investment that did not bear fruit."
After decedent's death, the policy was dropped permanently. David was indifferent to its continuance and gained nothing from the payments. Although decedent's estate was depleted by the payments, there was no "advantage" to David. We hold that under the particular facts of this case no collation is due. What might be the proper ruling with regard to premium payments on other types of insurance and in other fact situations is not before us now.
Several claims for collection by David revolve around his home. Decedent had given him a vacant lot on Pierson Street in Alexandria. In 1964 a home was built on the property and financed by a $12,000 loan secured by mortgage. David never lived in the home until after his mother's death. According to him, it was rented and the rents applied to the mortgage *1345 note, taxes and insurance. Any excess was divided between him and his mother who had initiated the construction and who handled the receipt of rentals and payments. Very shortly before her death, decedent borrowed $9,000 and paid off the mortgage loan on David's property. Claims for collation are made for (1) the value of the lot donated, (2) the mortgage payoff, (3) furnishing of the home, (4) payment of insurance and taxes on the period from 1964 to 1971, and (5) payment of a paving lien on an abutting street.
The trial judge disallowed the paving lien payoff (admitted by David to have been made by his mother) because the value of the paving was included in the realtor's appraisal of the lot which was decreed to be a collatable item. Counsel argue that such inclusion is surmise. We think not. When the appraisal was made the lot had the paving. The usual appraisal of a lot such as that takes into account the value of the paving. It is an integral part of the lot's value and is natural to the appraisal. If the situation were otherwise, it could have been easily shown by counsel who argues to that effect. We do not think it was David's burden to negate the exclusion of the paving value from the realtor's appraisal.
The trial judge disallowed the payment of taxes and insurance on the basis that his mother was the benefactor of the rents and that David was not living on the premises. Apparently, he believed David's testimony that the mother handled the rental receipts and that either she kept the residue or there was a 50-50 split between David and his mother. Counsel for Mrs. Whaley attempts to show that the rent was not sufficient to cover the mortgage note installments, insurance and taxes. We have carefully considered his argument but cannot agree with it. Even at $135 per month rent there were sufficient funds available. For most of the time involved, the rent was $150 per month.
Counsel further claims that the only evidence of rent during the period involved was the written lease for a small portion of the time and that to prove renting of the premises throughout the period other written leases or other evidence other than David's testimony was necessary. Apparently, the trial judge believed David's testimony regarding renting of the premises for most of the time involved. We cannot say there is any manifest error in that ruling.
Counsel for Mrs. Whaley argues that there is no proof that Mrs. Pierson ever received the rent monies. We think otherwise. David explained that his house was originally rented to a Mr. Kinney who was still available in Alexandria at the time of trial. He (David) had lost track of the other renters (mostly servicemen) and could not produce them at trial. Mr. Kinney produced rent-payment checks for the period of his occupancy of David's home. All these checks were payable to David but bore both his endorsement and that of his mother. In many cases, David's endorsement was in favor of his mother. In other instances when he endorsed in blank, his mother's endorsement was for deposit to her account. In all instances his mother's endorsement was on the checks. It is evident that Mrs. Pierson had control of the rent funds and that the checks in payment of the mortgage note installments cannot be considered an advantage to David.
With regard to the furnishing of the home, the trial judge allowed the cost of drapes paid by decedent in the amount of $772.23. He rejected the claim for value of certain items of furniture because of absence of a showing of their value. The cost of the drapes was clearly proven and no serious dispute is made as to this. As to the furniture, David admitted his mother bore the cost of furnishing the home and testified that it was done at minimum cost. There are in evidence 14 checks written by Mrs. Pierson at the time in question which were in all probability for prices of furniture or for redoing or repairing pieces of furniture. Several of these correspond with invoices clearly applicable to furniture for David Pierson's home. Some of these items involve repairs or redoing of furniture the end value of which must have been in excess of the amount paid for such services. *1346 By Civil Code Article 1283, the extent of collation of movable property is the value at the time of the donation. Considering these last two mentioned factors, we think that collation of at least $706.18 for furniture representing the total of those 14 checks would be due and will allow that additional amount or a total for furnishing the home of $1,478.41.
The trial court decreed collation of the value of the lot fixed by the realtor at the time of the succession opening in the amount of $13,956. There is no question but that the donation was made and that said evaluation is in line. However, the collatable amount must be restricted to the $10,000 claimed in the petition.
Additionally, the trial court decreed collation for the mortgage payoff in the amount of $8,059.09. No serious dispute exists as to this ruling except that concerning the remunerative donation later discussed.
At the time decedent paid off David's mortgage, she opened a savings account in his name with an initial deposit of $700. This was decreed collatable by the district court. No reason to the contrary is given and we will uphold the trial judge's ruling.
Counsel for David argues that the gift of the mortgage payoff and the $700 savings account are remunerative donations not subject to collation or reduction. Simultaneously with those transactions, decedent left David a note stating that ". . both the house and the account are from me in appreciation for all your loving care of me during my last years . . .". It seems clear that decedent intended to make a remunerative donation to David.
The parent-child presumption of gratuity regarding services rendered applies only when a claim is asserted against the estate in contract or quasi contract but it is not applicable when the services are asserted as forming the basis of a remunerative donation. See Succession of Formby, 243 La. 120, 142 So.2d 157 (1962). However, we do not think these gifts can be exempt from collation as remunerative donations. This is because the value of the services are not appreciable in money and are negligible in worth in relation to the value of the gifts. Pertinent to this discussion are Civil Code Article 1525 and 1526 which provide:
"Art. 1525. The remunerative donation is not a real donation, if the value of the services to be recompensed thereby being appreciated in money, should be little inferior to that of the gift.
Art. 1526. In consequence, the rules peculiar to donations inter vivos do not apply to onerous and remunerative donations, except when the value of the object given exceeds by one-half that of the charges or of the services."
It is well settled that a donation is not remunerative unless the services rendered are appreciable in money. See Succession of Formby, supra; Succession of Henry, 158 La. 516, 104 So. 310 (1925); Placid Oil Company v. Frazier, 126 So.2d 800 (La.App. 2nd Cir. 1961); Continental Oil Co. v. Tate, 211 La. 852, 30 So.2d 858 (1947); Succession of Rabasse, 49 La.Ann. 1405, 22 So. 767 (1897); Succession of Ames, 33 La.Ann. 1317 (1881); Williams v. Hardy, 15 La.Ann. 286 (1860); Succession of Waechter, 131 La. 505, 59 So. 918 (1912).
Decedent was financially independent and quite active until about two years prior to her death. David held a full-time job during the years in question. He and his mother were very companionable and attended common social functions. Besides this, the services performed constituted nothing more than ordinary errands or chores that naturally arise from the parent-child relationship. The testimony regarding the supposed services is generally unimpressive. It is impossible to conclude that they amount to any significant monetary value. Hence, we do not think they can form the basis for a remunerative donation of the amount involved herein.
Further claim is made by counsel for David that the gifts of the mortgage payoff and savings account deposit should not be collated because they were declared exempt from such by the note. It is true that there is other language in the note which is somewhat suggestive of an intent *1347 to exempt these gifts from collation. However, any such declaration that a gift is made as an advantage or extra portion when not in the instrument of donation, must be in authentic form. Civil Code Article 1232 provides that such declaration may be made after the donation ". . . by an act passed before a notary and two witnesses." Therefore, even if the note contained language unequivocally exempting those gifts from collation, the dispensation is ineffective because not in the form required by law.
Further claims are made against David for collation of monies received from his mother. The trial judge disallowed them for the reason that the mere issuance of checks to David did not constitute proof of donations and that if they represented loans it was the duty of the succession representative to collect those debts. We have previously pointed out that unpaid debts of an heir are subject to collation.
When David returned to Alexandria in 1956, he lived in a small garage apartment on his mother's home premises until approximately a year and a half prior to her death at which time he moved into the home. They were apparently very close, shared grocery expenses and obviously had many minor financial transactions between them.
In order to prove these collatable items, there were filed in evidence two batches of cancelled checks issued by Mrs. Pierson during the period from the late thirties to her death in '71 except for the period from 1949 to 1960. None of her cancelled checks issued between 1949 to 1960 were available.
Of the two groups of checks for which collation claims are made, one is made up of 113 checks totalling $804.73, all issued by Mrs. Pierson in favor of David and only one of these has any indication of its purpose. The other group is made up of 76 checks totalling $2,203.61, all issued by Mrs. Pierson to other parties with notations on the checks to the effect that the check was to be applied to David's account or that it was otherwise for his benefit.
David admitted that his mother helped him with his delinquent accounts on many occasions and that he had received gifts from her from time to time. He contends that the gifts were offset by services he rendered and that he repaid loans. In his deposition, he stated that he had cancelled checks for several years back but produced none of these at trial and claimed that his mother had urged him to destroy all his old records. We realize that it would have been unusual for David to have retained his cancelled checks for as long as thirty years back and feel a certain inadequacy in dealing with this issue. However, we cannot ignore the consistent pattern of transfers of money from Mrs. Pierson to her son. Those that were gifts must be collated. Those that were loans must be collated unless repaid. We have previously held that unpaid loans are collatable items.
However, because of the closeness of David and his mother and the fact that they shared the grocery bill there must have been many small monetary transactions between them represented by some of the checks. For instance, we note one of the checks to David is for $6.71 and was secondly endorsed by a seafood market. We cannot imagine how this could have constituted a loan to David or a payment by him of his sole account at such an establishment. We think these type checks represent transactions between him and his mother of a type other than loans or gifts. Additionally, in the group of checks payable to third parties, are notations indicating that they were not loans or collatable gifts. One of these is for Community Concert tickets for both Mrs. Pierson and David. As to David's ticket, this would be a gift for his own pleasure and use as provided by Civil Code Article 1245. Another check has a notation not that it is for David's account at the particular store but it is for "David's suit". This was in January. We do not think gifts on such rare occasions are collatable. They are also for the use and pleasure of the donee as per Civil Code Article 1245. It is impossible to discuss each of these individual checks which we have decided should or should not be collated. Of *1348 the group of checks representing payments directly to David, we have considered that a total of $734 must be collated. Of the group of checks representing payments to third parties, we have determined that a total of $1,010 must be collated. With the $700 previously decreed to be subject to collation, the total for cash items (gifts or unpaid loans) would amount to $2,534. This collation must be reduced to $2,000, the amount claimed in the petition.
Claims for collation by Hunter Pierson for payment by his mother of income taxes and the expenses of his daughter's reception were disallowed by the trial judge. There is no evidence in the record supporting these and we uphold the ruling of the district court.
For about 20 years, Hunter Pierson occupied rent-free a home owned by his mother at 3014 Marye Street. In addition to a claim for collation of the rental value of that home which we will discuss later, plaintiff's claim Hunter's estate should be made to collate sums paid by decedent for repairing and insuring this property. Insurance and repair constitute upkeep on maintenance and were for the benefit and advantage of the property and its owner who was decedent. No advantage went to Hunter for this except indirectly as to the rental value with which we will deal separately. No authority is shown to characterize these items as collatable and they must be disallowed. Further, the evidence is clear that Hunter put much more into the home by way of renovations and additions than did his mother.
A claim was made for collation by Hunter of the value of furnishing the Marye Street residence. No proof was made as to these items except that Hunter admitted his mother gave him a used bed. We do not believe that this item should be collated.
In Succession of Gomez, 223 La. 859, 67 So.2d 156 (1953) appears a thorough discussion of the legal exemptions from collation provided by Civil Code Articles 1244 and 1245. In dealing with the meaning of the exemption in the latter article, the court stated:
"When the redactors used the expression `by their own hands, to one of their children for his pleasure or other use', they were contemplating those things usual for parents of this country to give to a child without thought or regard to his having to account for them to his coheirs. The word `pleasure' has special significance in this respect because it best describes the motive that usually prompts the giving of such things. The language the redactors chose to describe this kind of giving was broad and elastic enough to keep apace of changes in our social development."
The value of the bed was estimated at $200. Particularly significant is that it was given when Hunter furnished his own abode. Considering the nature of the item, its value and the special occasion upon which it was given, we conclude that it is exempt from collation as one of "... those things usual for parents of this country to give to a child without thought or regard to his having to account for them to his co-heirs."
The trial judge held proof was insufficient to show a donation of any Ammen Company stock to Hunter by his mother. The inventory in Dr. Pierson's estate showed 78 shares of this stock. A later correction showed that 5 had been previously transferred to Clarence, Jr. Of the 73 shares actually in the estate 60 were purchased by Mrs. Pierson and 13 remained in the estate when it was closed out. When the company was liquidated in 1947, the list of stockholders showed Mrs. Pierson as having 66½ shares. Clarence had 5 shares and the Estate of Dr. Clarence Pierson had 6½ shares. This totals the inventoried number of 78 shares. This list also showed Hunter having one share. A 5-share certificate endorsed by Mrs. Pierson to Hunter was filed in evidence. Apparently it was never transferred on the books of the company. In view of the above listing of owners at dissolution of the corporation, we do not think the mere endorsement on the certificate constitutes proof of a donation. In his deposition, Hunter said he thought one *1349 share had been placed in his name so that he could act as a director. He doubted that he received any liquidating dividends from this share. For two or three years after the company was dissolved, Hunter's income tax returns showed long-term capital gains in the forms of liquidating dividends from Ammen Company stock. In all these cases, the date of acquisition of the stock was given as 1934, the date of his father's death. Evidently the dividends represented his interest in the 6½ shares listed on the company's stockholder list as belonging to Dr. Pierson's estate. We agree with the trial judge that the proof is insufficient to show that Mrs. Pierson donated any stock to Hunter from which he received any benefit.
Another claim for collation by Hunter's estate is the value of a 1958 Ford automobile. Hunter admitted this donation. Trial judge disallowed it because of lack of evidence of the value. There is nothing in the record to show the value of the automobile at the time in question. A suggestion is made by counsel that we assign a figure of $2,000 for the value. We think the holding below was correct. The party asserting collation must show the value of the item to be collated. This is not a situation where an exact amount cannot be shown and the court must determine some fair minimum in the interest of justice. The exact value of the automobile could have been easily proved. We must disallow this claim.
Plaintiffs claim collations due by Hunter for money transferred to him from his mother. The trial judge held that there was not sufficient proof that these were actual gifts and if loans they were not collatable.
Mrs. Pierson died in February, 1971, and Hunter about a year later. In June, 1971, Hunter's deposition was taken, and it was introduced at trial. He admitted some loans from his mother and denied gifts of any substantial amounts. He thought he had retained his checks for some years back and that they would be available. He explained that over the years he had handled different transactions for his mother and that cash or checks had passed between them on many occasions for these transactions.
Hunter married shortly after his return to Alexandria to start practicing law in 1947. His family grew rapidly. The evidence is clear that he was continuously in financial straits until his mother's death. During all those years, his mother, if not actually affluent, was never pressed for money. There is testimony that decedent was strict in business and any loan by her would have been repaid and that she often called Hunter down with regard to his indebtedness to her. Other evidence indicates that Hunter had much leeway with his mother financially and that he generally received favored treatment from her.
To prove the collatable gifts or loans, plaintiffs filed in evidence 38 cancelled checks from decedent to Hunter totalling $5,035. Except for one which was designated as a loan, none of these bore any notations as to their purpose. A few of these were in the late forties but most span the period from 1961 to 1971. In his discovery deposition, Hunter was questioned about most of these checks and was unable to recollect them except one check for $350 issued about two weeks prior to his mother's death which he recollected as being given for some business affair of his mother but could not explain it specifically. We do not necessarily take the view that Hunter ought to have had any specific recollection of these checks and we mention this questioning of Hunter and his response mainly to show the state of the known issues at that time in relation to what evidence was eventually produced. Counsel for Hunter's estate filed in evidence 21 cancelled checks from him to his mother issued from 1965 to 1969. One of these is not pertinent to this issue. The remaining 20 total $1,206. None of these bear any notation as to their purpose.
Again, as in the case of David, we feel a certain inadequacy in dealing with this issue. However, upon considering the various general factors previously noted pertaining to Hunter's financial condition *1350 as compared to his mother's, their relationship and his state in life during the years involved, we feel that less error would be committed in reaching some collatable figure than in disallowing collation altogether. Of the 38 checks to Hunter, we will disallow 16 which are for small, odd amounts and probably represented business transactions between the two of them other than loans or gifts. The remaining 22 checks are for rounded figures and substantial sums. Only three of them are below $100. Most are for $100 to $300 and a few are in excess of that. Except for one in 1948 in the amount of $75 which bears a loan notation on it, all these are between the years 1961 to 1971. They total $4,426. Against this figure, we think it fair to offset the total of the checks by Hunter to his mother in the amount of $1,206. This leaves a net collatable amount of $3,220.
Claims for collation against both Hunter and David were made for the rental value of the properties (the garage apartment and the Marye Street residence) occupied by them for a number of years. Additionally, a collation claim was made against David for board for the same period. We think the evidence preponderates that David and his mother shared board expenses and that claim will be disallowed. The trial judge rejected the claims for rental values as a matter of law. His reasoning was that the value of occupancy was equivalent to the revenue that would have been derived from the properties and that revenue, as distinguished from capital, is not collatable as it would have been used by the decedent anyway and hence there was no depletion of his estate. He further stated that if the properties had been donated, the donees would not have had to collate the revenue (rental) of these items.
Louisiana Civil Code Articles 1243 through 1248 deal with what things are subject to collation. Article 1243 specifies those types of benefits subject to collation. Articles 1244 through 1247 deal with various types of benefits to an heir which are not subject to collation. Article 1248 is a sort of catchall provision mandating collation generally. Articles 851 through 856 of the Code Napoleon deal with what matters are collatable and contain substantially the same language as Articles 1243 through 1247 except that there is no counterpart to Civil Code Article 1248 in the Code Napoleon and there is contained in the Code Napoleon an article (856) which provides that the revenue of the thing subject to collation is not due until the opening of the succession. From this codal scheme, the Louisiana Jurisprudence has approached the question of what is collatable by starting with the general rule that collation is due for any benefit or advantage and that any exemption or dispensation from it is the exception.
This approach was used in the scholarly opinion in Succession of Gomez, supra. That case dealt with manual gifts of money. Although it dealt with the manner in which the benefit or advantage was conferred and not with the nature of the benefit conferred, we think the Gomez rationale is pertinent here.
The court stated:
"Finally, then, the law contemplates a perfect equality among heirs and presumes that the ascendant intends equality among his heirs. Our rules of collation have come into existence to maintain and effectuate this equality, and they permit collation to be dispensed with only when the intention of the ascendant to dispense has been manifested expressly and in the manner provided by law. Benoit v. Benoit's Heirs, 8 La. 228; Grandchamps v. Delpeuch, 7 Rob. 429; Berthelot v. Fitch, 44 La.Ann. 503, 10 So. 867; King v. King, 107 La. 437, 31 So. 894; Champagne v. Champagne, 125 La. 408, 51 So. 440; Jung v. Stewart, 190 La. 91, 181 So. 867. The law exempts, however, in Articles 1244 and 1245 of the Code of 1870 certain things from collation. By virtue of this legal exemption an express intention on the part of the donor to dispense with collation of these things is not required. Because this legal exemption may operate to destroy the equality among the heirs, nothing should be exempt from collation unless it falls squarely within the *1351 provisions of these articles. (Emphasis herein)

* * * * * *
We have concluded, therefore, that it was never the intention and purpose of the redactors of the Code of 1825 to make a drastic change from the provisions of the 1808 Code relating to exemptions or, for that matter, a radical departure from our fundamental concept of collation. Any other conclusion would be inconsistent with the emphasis on equality in the general provisions relating to the nature of collation and the strict rules for maintaining that equality. Legal exemptions from collation have always been based on the soundest groundsthe things exempt were by their nature not really advancements because they were obligations of the parent, or they were things given under such circumstances as to overcome the presumption that they were advancements."
Determinative here are the court's two observations: (1) That only exemptions squarely within the terms of the pertinent articles are to be recognized and (2) that those exemptions either pertain to obligations of the decedent to the child or result from benefits conferred under circumstances naturally indicative of an intent to confer an advantage or extra portion.
We realize that, as pointed out by the learned trial judge, respectable authority among the French commentators holds that a gift of revenues is not collatable. This view of the learned French scholars is based on Code Napoleon Article 856 which provides that revenues from a collatable item are only due from the opening of the succession. But our code does not contain any counterpart to Code Napoleon Article 856 in the section dealing with collation. In Cross On Successions, at page 523, is found the following observation:
"C. N. 856 provides that `the fruits and interest of the things subject to collation are due only from the day of the opening of the succession.' This rule is the consequence of the principle, that the property donated as an advancement d'hoirie is supposed to be immediately reunited to the succession at the death of the deceased. The object of its insertion in that Code seems however, to be, to protect the donee from a claim for the revenues accruing before the opening of the succession. `We have already seen, under Article 852,' [Louisiana Civil Code Article 1244] says Marcade (III, 343) `that the gift of simple revenues not encroaching on the capital are not subject to collation. The law considers that the deceased would have spent it some other way, and in living with less economy the periodical revenues with which he has gratified his successible would have been used, and that consequently the donation has not diminished the quantity of property he has left. This principle has been recognized in our article. When the deceased has given a farm, a house, or other property, the heir should collate this property, but not the revenues which he has derived from it; the property is, in fact, a capital, the absence of which would diminish the patrimony; but its fruits on the contrary are only revenues that the deceased would probably have spent otherwise.' This article has not been reproduced in our Code, and it is held in LeBlanc vs. Bertant (16 A. 298) that, where it is presumed from circumstances that the mother intended to make a remission of interest to her sons on a loan of money to them, the interest remitted should be considered an advance on their portion of the succession and should be collated."
However, the contention of Cross was not accepted as law. In Clark v. Hedden, 109 La. 147, 33 So. 116 (1902) the Supreme Court held that collation is not due for revenues of property, the full ownership of which had been donated. The court relied on Civil Code Article 1515 which by its terms applies only to revenues from donated property subject to reduction. No mention was made of the limited applicability of that article nor of the fact that Code Napoleon Article 856 which exempted from collation revenues of collatable items was in *1352 the 1808 code but omitted from the 1825 and 1870 codes.[1] While the rule in Clark may be dispositive on the precise question of whether revenues from collatable items are exempt, it does not follow that the rule is by analogy obligatory on this court in dealing with the question of whether collation is due for the value of donated use, occupancy or habitation which themselves constitute the benefit or advantage.
Here David and Hunter did not own the apartment or the house. They did not even have the usufruct of these. Theirs were only the rights of habitation or use. This produced no revenues. In a sense, what they had was the equivalent of revenue. But to make them collate the value of their occupancy and not compel an owner to collate the value of the revenues produced by the thing owned is not contradictory. In both cases the donee or beneficiary returns to the ancestor's estate the value equivalent of exactly what he gotin one case the basic ownership and in the other the occupancy.
Other considerations might warrant a difference in treatment between an heir given basic ownership and one who gets only a portion of the ownership. The hardship and problems of making the latter account for the revenues could justify the difference.
We cannot agree with the view that revenues should not be collated because the gift of such does not deplete the ancestor's estate. Depletion of the estate would be germane to a reduction situation. There, the ultimate value of the estate is the question. But, as to collation, benefit or advantage to the heir is the test regardless of whether the estate is depleted. Although there is no depletion of the estate, any benefit or advantage to an heir affects presumed equality.
Even if depletion of the ancestor's estate would be pertinent, to hold that a gift of revenue never depletes the donor's ultimate estate is unrealistic. Modern investment practices do not justify such a view. The question of depletion, vel non, should be resolved on the facts of each particular case.
If decedent had barely subsisted from month to month and left no assets of any consequence, it could be argued that she would have consumed the rental revenues of the properties occupied by her children and the free occupancy would have had no effect on her estate's ultimate value. The record herein clearly shows the contrary. Mrs. Pierson lived to the full extent of her wishes during the years of free occupancy. Her estate was considerable. If she had rented out the properties instead of allowing their free use by her children, the estate would have been increased pro tanto.
Accordingly, we hold that a gift of use or habitation is not exempt from collation solely because of its nature as the equivalent of revenue or because revenues from collatable items are deemed exempt from collation. By this ruling, we do not intend to require collation of every use or occupancy permitted by a parent to a child. Many of these will be so trifling, temporary, intermittent, on such occasions and under such circumstances that they would clearly fall within the language of the Gomez case as ". . . things usual for parents of this country to give to a child without thought or regard to his having to account for them to his co-heirs."
We think that the permitted occupancy of the garage apartment by David should be exempt from collation. David was never married; he and his mother were very close. He assisted her in many ways. Originally, he occupied a room in the family residence. After a maid who occupied the garage apartment left, he moved into it. The apartment was very meagre; its rental value was estimated at $25 per month. In winter, David was forced to move into the family residence with his mother. He actually lived in the family home with her for several months prior to her death. The *1353 arrangement was to a large extent for Mrs. Pierson's convenience and requirements. Considering all these circumstances, we conclude that the permitted occupancy was ". . . was without thought or regard to his [David's] having to account for them [it] to his co-heirs."
Hunter moved into the residence around 1950 and paid rental for two years. He then added onto the house and thereafter paid only the taxes and insurance. A realtor fixed the rental value from 1952 to 1960 at $100 per month and thereafter at $120 per month. This would amount to $24,000. We cannot say that the whole rental value should be collated because it was not completely free. Hunter paid about $2,000 for the addition which inured to the value of the property and consequently the estate. Additionally, he paid insurance and taxes for the 18 years involved. The payments for the addition, insurance and taxes were part of the overall arrangement between him and his mother and should be calculated into the amount due. From the record available, we calculate the taxes and insurance paid for the 18 years at $2,880. We will allow this total of $4,880 for the addition, insurance and taxes as a credit against the gross rental of $24,000 leaving a net collatable figure of $19,120.
Argument is made that decedent made donations of roughly equal value to all of her children in the form of the three lots and the automobile to Hunter, that no equality existed then because those donations had approximately equal value at the time made and that, because collation is to protect against inequality, none should be ordered as to these items. It is pointed out that more inequality results by collating these items as per their value at the time of opening the succession than by disregarding the donations as not creating any inequality at the time of their confection. This argument does have some appeal to equity. However, though ordaining equality among the heirs as the ultimate aim of collation, the law specifies certain rules or guidelines which we must follow. Civil Code Articles 1269 and 1270 clearly declare that, subject to certain exceptions in other articles, immovable property must be evaluated as of the time of opening the succession. We are unable to ignore or deviate from this precise formula. The argument must be addressed to the legislature instead of the courts.
Request is made that we proceed to determine the reductions due in this succession. It does not appear that the record is so complete as to allow this. Most of the ordinary debts of the estate have been paid but there may be others not shown in the record such as law charges or possibly estate taxes. Accordingly, we must relegate the determination of reductions to further proceedings in the district court.
We now recapitulate the collations due as follows:

1. By Mrs. Diane Whaley
 (a) Lot 1, Block 7, Mimosa Place $20,000.00
 (b) Funeral expenses of her father
 Clarence Pierson, Jr. 1,184.80
 ____________
 Total..... $21,184.80
2. By Mrs. Louise Pierson Marshall
 (a) Lot 3, Block 3, Mimosa Place $15,000.00
 (b) Cash 1,015.48
 ____________
 Total.... $16,015.48
3. By David Pierson
 (a) Mortgage payoff on premises
 804 Pierson Street $ 8,059.09
 (b) Cash donations 2,000.00
 (c) Furnishing home at 804 Pierson
 Street 1,478.41
 (d) Gift of lot of ground at 804
 Pierson Street 10,000.00
 ___________
 Total... $21,537.50
4. By Hunter Pierson
 (a) Free rental of premises at 3014
 Marye Street $19,120.00
 (b) Gifts by check and cash 3,220.00
 ___________
 Total..... $22,340.00

Accordingly, for reasons assigned, the judgment of the district court is amended so as to provide that the Estate of Hunter Pierson collate the sum of $22,340, David *1354 Pierson collate the sum of $21,537.50, Mrs. Louise Pierson Marshall collate the sum of $16,015.48, Mrs. Diane Whaley collate the sum of $21,184.80, and as amended, it is affirmed. It is further ordered that this case be remanded to the district court for further proceedings in conformity with this opinion and that all costs of this appeal be borne by the parties equally.
AMENDED AND REMANDED.
HOOD, J., concurs in the result.
NOTES
[*] Hood, J., voted to grant a rehearing being of the opinion that we erred in requiring the Estate of Hunter Pierson to collate the rental value of the Marge Street premises.
[1] See Concordance for Code Napoleon in 17 L.S.A. Civil Code Comp.Ed. p. 890.